Case No. 12-3545/3576

# United States Court Of Appeals
# For The Sixth Circuit

GROENEVELD TRANSPORT EFFICIENCY, INC.,

Plaintiff-Appellee Cross-Appellant,

vs.

LUBECORE INTERNATIONAL, INC.,

Defendant-Appellant Cross-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

**BRIEF OF APPELLANT CROSS-APPELLEE
LUBECORE INTERNATIONAL, INC.**

Thomas L. Anastos  (0043545)
Melissa L. Zujkowski (0078227)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile:  (216) 583-7001
tanastos@ulmer.com
mzujkowski@ulmer.com

**Oral Argument Requested**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GROENEVELD TRANSPORT EFFICIENCY, INC. | ) ) ) | |
| Plaintiff – Appellee, | ) ) | CASE NO. 12-3545 |
| vs. | ) ) | |
| LUBECORE INTERNATIONAL, INC., | ) ) | |
| Defendant – Appellant. | ) | |

# DISCLOSURE OF CORPORATE AFFILIATIONS
# AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1,  Lubecore International, Inc.  makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  NO


2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?   NO

   If the answer is YES, list the identity of such corporation and the nature of the financial interest:


   /s/ Thomas L. Anastos                                   October 22, 2012
Thomas L. Anastos  (0043545)                       (Date)

i

# CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ....................................... vii

I.    JURISDICTIONAL STATEMENT ................................................. 1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .................. 2

III.  STATEMENT OF THE CASE ...................................................... 3

   A.   This Case Is About Affording Trade Dress Protection To The Shape And Appearance Of A Grease Pump. ........................................ 3

   B.   The Claims Asserted By Groeneveld. .................................................... 4

   C.   Denial of Groeneveld's Preliminary Injunction. ................................... 4

   D.   Summary Judgment and Trial. ............................................................. 5

   E.   The District Court's Denial Of Lubecore's Renewed Motion For Judgment As A Matter Of Law Or For A New Trial. .......................... 6

IV.   STATEMENT OF FACTS ......................................................... 7

   A.   The Parties. ........................................................................................... 7

   B.   The Pumps. ............................................................................................ 9

V.    SUMMARY OF ARGUMENT ................................................... 10

VI.   ARGUMENT ....................................................................... 12

   A.   The Standard Of Review. ...................................................................... 12

   B.   The Elements Of A Trade Dress Claim. ............................................. 13

   C.   There Was Insufficient Evidence For The Issue Of Functionality To Go To The Jury ................................................................................ 14

      1.   Groeneveld Had to Prove That the Functional Features of Its Pump Are Configured in an Arbitrary, Fanciful or Distinctive Way And That the Configuration Was Not Influenced by Engineering Necessity. ....................................... 14

**2.** The Groeneveld Pump Is Nothing More Than the Sum of Its Functional Features. ............................................................. 18

**3.** There Is Nothing Arbitrary about the Configuration of the Groeneveld Pump's Functional Features and That Engineering Necessity Influenced the Configuration of the Pump's Functional Features. ................................................ 20

D. There Was Insufficient Evidence To Submit The Issue Of Likelihood Of Confusion To The Jury Or, Alternatively And Jointly, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence. .............................. 25

**1.** The Strong Visual Impression of Dissimilarity between the Two Pumps Itself Should Be Dispositive of This Case. ........................................................................................ 26

**2.** There Was No Evidence of Actual Confusion. ......................... 33

**3.** Purchasers of Automated Lubrication Systems Are Sophisticated Consumers Who Take Great Care in Selecting which Product to Buy. ................................................ 35

**4.** There Was No Evidence That Lubecore Intended to Confuse or Deceive Anyone Regarding the Source or Origin of Its Pump. .................................................................. 38

**5.** Groeneveld Presented No Evidence That Consumers Rely on the Pump's Configuration to Identify It as a Groeneveld Pump. .................................................................. 41

**6.** Lubecore And Groeneveld Do Not Typically Market Their Pumps through the Same Channels. ................................ 42

**7.** The Relatedness of the Pumps Is Entirely Offset by Lubecore's Distinct Labeling And Marketing. ......................... 43

**8.** There Was No Evidence Relating to the Likelihood of Either Party Expanding Its Product Lines. ................................ 43

E. There Was Insufficient Evidence To Submit The Issue Of Secondary Meaning To The Jury Or, Alternatively, Lubecore Is

Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence. .................................................... 43

F.    Lubecore Is Entitled To Judgment As A Matter Of Law, Or Alternatively, A New Trial Regarding Groeneveld's Damages For Lack Of Any Evidence Of A Causal Link To Lubecore's Alleged Infringement And Because Groeneveld's Damages Theory Was Speculative. ................................................... 46

    1.    Groeneveld Was Awarded Actual Lost Profits, Not Disgorgement of Lubecore's Profits ......................................... 46

    2.    There is No Causal Link Between Groeneveld's Claimed Lost Profits Damages and Lubecore's Alleged Trade Dress Infringement. ................................................. 49

    3.    Groeneveld's Claimed Lost Profits Damages Are Speculative and, Therefore, Not Recoverable. .......................... 53

VII.    CONCLUSION. ......................................................................... 55

Certificate of Compliance .......................................................... 56

Certificate of Service .................................................................. 57

Designation of Relevant District Court Documents ............................................. 58

# TABLE OF AUTHORITIES

## Cases

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
    280 F.3d 619 (6th Cir. 2002).........................................................*passim*

*Agric. Servs. Ass'n v. Ferry-Morse Seed Co.*,
    551 F.2d 1057 (6th Cir. 1977) ............................................................53

*Barnes v. City of Cincinnati*,
    401 F.3d 729 (6th Cir. 2005)...............................................................12

*Baumer v. Franklin County Distilling Co.*,
    135 F.2d 384 (6th Cir. 1943)...............................................................53

*Bijur Lubricating Corp. v. Devco Corp.*,
    332 F. Supp. 2d 722 (D. N.J. 2004) ....................................................37

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
    973 F.2d 1033 (2d Cir. 1992)..............................................................28

*Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*,
    923 F. 2d 1232 (6th Cir. 1991).......................................................49, 52

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
    94 F.3d 376 (7th Cir. 1996)...................................... 29, 30, 34, 35, 39

*Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*,
    626 F.2d 193 (1st Cir. 1980) ...............................................................29

*Frisch's Restaurant, Inc. v. Shoney's Inc.*,
    759 F.2d 1261 (6th Cir. 1985) .......................................................26, 28

*General Motors Corp. v. Lanard Toys Ltd.*,
    468 F.3d 405 (6th Cir. 2006)......................................... 13, 22, 44, 45

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*,
   423 F.3d 539 (6th Cir. 2005)..................................................................13

*Grantham and Mann, Inc. v. American Safety Prods.*,
   831 F. 2d 596 (6th Cir. 1987)................................................................50

*Imwalle v. Reliance Med. Prods. Inc.*,
   515 F.3d 531 (6th Cir. 2008)................................................................12

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982) .............................................................. 15, 16, 43

*Jeffrey Chain, L.P., v. Tropodyne Corp.*,
   2000 U.S. App. LEXIS 33926 (Dec. 20, 2000) ............................ 51, 52

*Leatherman Tool Group., Inc. v. Cooper Indus.*,
   199 F.3d 1009 (9th Cir. 1999) ........................................ 14, 17, 18, 25

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
   511 F.3d 350 (3d Cir. 2007)..................................................................28

*Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*,
   963 F.2d 628 (3d Cir. 1992)..................................................................28

*Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*,
   754 F. 2d 738 (7th Cir. 1986)................................................................49

*Rush v. Illinois Century R.R. Co.*,
   399 F.3d 705 (6th Cir. 2005)........................................................ 12-13

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
   668 F.3d 677 (9th Cir. 2012)........................................... 23, 24, 25

*Shoreline Dev., Inc. v. Cendant Corp.*,
    2002 U.S. Dist. LEXIS 7836 (N.D. Ohio April 23, 2002) ................................53

*Syndicate Sale, Inc. v. Hampshire Paper Corp.*,
   192 F.3d 633 (7th Cir. 1999)................................................................28

*Tenneco Auto. Operating Co. v. Kingdom Auto Parts*,
   2010 U.S. Dist. LEXIS 22571 (6th Cir. Oct. 28, 2010).......................................45

*The Antioch Co. v. Western Trimming Corp.*,
   347 F.3d 150 (6th Cir. 2003).................................................................... *passim*

*Tobin v. Astra Pharm. Prods., Inc.*,
   993 F.2d 528 (6th Cir. 1993).............................................................................13

*Traffix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001) ........................................................... 13, 14, 15, 16

*U.S. Structures, Inc. v. J.P. Structures, Inc.*,
   130 F. 3d 1185 (6th Cir. 1997).........................................................................48

*Versa Prods. Co. v Bifold Co.*,
   50 F.3d 189 (3d Cir. 1995)......................................................... *passim*

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
   529 U.S. 205 (2000) ......................................................... 13, 38, 45

## Statutes

15 U.S.C. § 1117(a) ................................................................... 46, 47, 48

15 U.S.C. § 1125(a) ...........................................................................3

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

28 U.S.C. § 1332 ..............................................................................1

28 U.S.C. § 1338 ..............................................................................1

28 U.S.C. § 1367 ..............................................................................1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Lubecore International, Inc. respectfully requests that the Court hear oral argument in this appeal.  The complexity of the issues raised in this appeal and the ramifications of this Court's resolution of this appeal on the body of law relating to protecting the configuration of industrial products as trade dress under the Lanham Act all warrant the Court hearing oral argument.

# I.    JURISDICTIONAL STATEMENT

This is an appeal under 28 U.S.C. § 1291 from a final judgment, disposing of all parties' claims, that was entered by the United States District Court for the Northern District of Ohio on October 26, 2011.  Appellant's Notice of Appeal was filed on April 30, 2012 and Appellant's Amended Notice of Appeal was filed on May 3, 2012.  The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity); 28 U.S.C. §§ 1331 and 1338 (federal statute); and 28 U.S.C. §§ 1367 and 1338 (supplemental jurisdiction).

## II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Lubecore International, Inc. ("Lubecore") Should Have Been Granted Judgment As A Matter Of Law On The Trade Dress Claim Of Groeneveld Transport Efficiency, Inc. ("Groeneveld") Because Groeneveld Presented Insufficient Evidence That The Configuration Of The Groeneveld Grease Pump Is Non-Functional, That It Has Acquired Secondary Meaning, Or That There Is A Likelihood Of Confusion Between The Groeneveld And Lubecore Grease Pumps.

2.    Lubecore Should Have Been Granted A New Trial Because The Findings That The Configuration Of The Groeneveld Grease Pump Is Non-Functional, That It Has Acquired Secondary Meaning, And That There Is A Likelihood Of Confusion Between The Groeneveld And Lubecore Grease Pumps Are Against The Weight Of The Evidence.

3.    Lubecore Should Have Been Granted Judgment As A Matter Of Law On The Claim That Groeneveld Had Suffered Actual Lost Profit Damages Because Groeneveld Presented Insufficient Evidence Of A Causal Link Between Groeneveld's Lost Sales And Lubecore's Sales.

4.    Lubecore Should Have Been Granted A New Trial On Damages Because The Finding That Groeneveld Had Suffered Actual Lost Profit Damages Is Against The Weight Of The Evidence For Lack Of A Causal Link Between Groeneveld's Lost Sales And Lubecore's Sales.

## III.    STATEMENT OF THE CASE

### A.    This Case Is About Affording Trade Dress Protection To The Shape And Appearance Of A Grease Pump.

The case is about whether the shape and appearance of a grease pump manufactured by Plaintiff-Appellee Groeneveld Transport Efficiency, Inc. ("Groeneveld") can be protected as trade dress under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and, if so, whether a grease pump manufactured by Defendant-Appellant Lubecore International, Inc. ("Lubecore") infringes the trade dress of the Groeneveld pump.

The Groeneveld and Lubecore pumps at issue here look like this:



They are the primary functioning components of "automated lubrication systems" that are used mostly on large, over-the-road, trucks. At timed intervals, these pumps deliver bursts of grease through injectors and hoses to all of the greasing points on a truck. The pump itself typically consists of a grease

3

reservoir and a pumping mechanism.  Groeneveld and Lubecore are competitors in the market for automated lubrication systems.

## B.     The Claims Asserted By Groeneveld.

On April 2, 2010, Groeneveld filed a Complaint in the Northern District of Ohio alleging these five claims: (1) trade dress infringement in violation of the Lanham Act; (2) unfair competition in violation of the Lanham Act; (3) unfair and deceptive trade practices in violation of the Ohio Consumer Sales Practices Act; (4) common law unfair competition; and (5) tortious interference with contracts and/or business relationships.  (Compl., RE 1.)  At the same time, Groeneveld moved for a preliminary injunction prohibiting Lubecore from selling its pump in the United States.  (Mot. for Preliminary Inj., RE 4.)

## C.     Denial of Groeneveld's Preliminary Injunction.

Judge Nugent referred the preliminary injunction motion to Magistrate Judge Baughman.  Following a four-day hearing (that began on October 4, 2010), the Magistrate Judge, on February 28, 2011, denied Groeneveld's Motion for Preliminary Injunction.  (Mem. Op. and Order, RE 88.)

In so holding, the Magistrate Judge found it unlikely that Groeneveld would succeed in establishing any of the three elements necessary for a trade dress claim—non-functionality, secondary meaning, and likelihood of confusion.  The Magistrate Judge found that "all the elements of Groeneveld's pump are there for

some practical benefit or reason" and that "the evidence in this matter is clear that the parts in the pump at issue are what they are, and are located where they are, for utilitarian, not aesthetic, reasons." (*Id.*, Page ID # 2054.)  In other words, he found nothing about Groeneveld's pump to be remotely analogous to "an automotive tail fin—a purely ornamental feature that contributes no demonstrable benefit to the operation or efficiency of the designed product."  (*Id.* Page ID # 2055.)

### D.    Summary Judgment and Trial.

On June 6, 2011, Lubecore filed a Motion for Summary Judgment and Groeneveld filed a Partial Motion for Summary Judgment. Both motions were denied on July 27, 2011.  The trial began on October 13, 2011.  Lubecore moved for judgment as a matter of law under Fed. R. Civ. P. 50 at the close of the Groeneveld's case. During the argument on that motion, Judge Nugent focused on Groeneveld's inability to prove that the configuration of its pump was non-functional, and ordered Groeneveld to present the testimony it was relying on to establish non-functionality.  (Transcript, RE 324, Page ID # 8646-64.)  Groeneveld then presented excerpts from the testimony of Willem Van Der Hulst, the witness it was relying on to establish non-functionality.  Judge Nugent expressed his skepticism with respect to Groeneveld's ability to establish non-functionality, kept Lubecore's Rule 50 motion under advisement, and the trial continued.  (Transcript, RE 325, Page ID # 8667-81.)

At the close of Lubecore's case, and with no additional evidence having been presented as to non-functionality, Judge Nugent again considered the Rule 50 motion. Groeneveld again presented excerpts from Mr. Van Der Hulst's testimony. Following additional argument, Judge Nugent granted Lubecore's Rule 50 motion with respect to Counts 2-6 of Groeneveld's Complaint, but reserved ruling on Count 1, which was submitted to the jury. (Transcript, RE 325, Page ID # 8740-63.) The jury then returned a verdict in favor of Groeneveld for trade dress infringement and awarded Groeneveld $1,225,000 in damages. On October 21, 2011, the jury found the infringement was "willful." (Mins. of Proceedings, RE 223.) Among other things, Groeneveld subsequently moved for enhanced damages of in the amount of $4,900,000. (Mot. for Enhanced Damages, RE 237.)

### E.    The District Court's Denial Of Lubecore's Renewed Motion For Judgment As A Matter Of Law Or For A New Trial.

On November 23, 2011, Lubecore filed a Renewed Motion for Judgment as a Matter of Law or, in the Alternative and Jointly, Motion for a New Trial (RE 242), which was denied on April 4, 2012. (Mem. Op. and Order, RE 280.) On the same day, Judge Nugent also entered an injunction against Lubecore, granted Groeneveld's Motion for Attorneys' Fees, and denied Groeneveld's

6

Motion for Enhanced Damages. (Permanent Injunction, RE 279; Mem. Op. and Order, RE 281; Mem. Op. and Order, RE 283.)

Lubecore filed its Notice of Appeal on April 30, 2012.

## IV.    STATEMENT OF FACTS

### A.    The Parties.

Groeneveld and Lubecore are competitors in the market for automated lubrication systems.  They both distribute several products, but this case concerns only one of them: a single-line, pneumatic, zero-grease, automated lubrication pump that is a component part of a greasing system used primarily in commercial trucks.  Groeneveld's pump and Lubecore's competing pump look like this:



Plaintiff Groeneveld is a United States branch of the Dutch company Groeneveld Group B.V. that was opened in 1993.  Overall, the Groeneveld entities have thousands of employees.   (Transcript, RE 321, Page ID # 8011-14; 8021-22.)

Groeneveld started selling the pump at issue here in the 1980s.  (*Id.*, Page ID # 8018-8019.)

Lubecore has 12 employees and is owned by Jan Eisses and his wife. (Transcript, RE 324, Page ID # 8564.)   Mr. Eisses founded Lubecore, previously known as Orlaco Crane Cam, in 2007.  (*Id.*, Page ID # 8541, 8546-47; 8563.) Prior to starting Lubecore, Mr. Eisses was a Groeneveld distributor and later a Groeneveld employee.  In two transactions in 2001 and 2004, Mr. Eisses sold his company, CPL Systems Canada, Inc., to Groeneveld Transport Efficiency International Holding B.V.  He was employed by CPL Systems Canada, Inc., as a wholly owned subsidiary of Groeneveld, from 2004 until January of 2007.  (*Id.*, Page ID # 8528-31; 8539-41.)

In approximately December 2007—almost a year after his departure from Groeneveld—Mr. Eisses began working with Martin Vermeulen, his contact at Tae Sung, a South Korean company, to design an automated lubrication system for Lubecore.  Mr. Vermeulen had previously been employed by Groeneveld.  Mr. Eisses explained the improvements that he wanted to see in his new product as compared to the existing industry pumps.   Incorporating those requests, Mr. Vermeulen designed a pump for Lubecore, the pump that is now at issue in this case.  (*Id.*, Page ID # 8550-56.)

8

In contrast with Groeneveld, Lubecore is a relatively new market entrant: Lubecore began marketing its product in Canada in April 2008 and made its first sale in the United States in March 2009.  (*Id.*, Page ID # 8564.)

### B.    The Pumps.

The Groeneveld and Lubecore pumps look and function in much the same manner.  Both have a clear, covered grease reservoir which is attached to a black housing containing the piston.  The piston forces grease into the mainline hose. The mainline hose then branches off to smaller hoses that are eventually connected to the vehicle's lubrication points.  A spring-loaded follower plate inside both reservoirs moves up and down as the volume of grease in the reservoir increases and decreases.  (PX 3, 4, 48, 49, 50, 59-18, Apx 30, 34, 118, 153, 172.) Neither product is protected by a patent.

Despite the similar shapes and sizes of the pumps that Groeneveld and Lubecore sell today, the two pumps are visually distinct.  Groeneveld's reservoir bears its name, its green logo, and a band of "Groeneveld" green.  Groeneveld's logo also appears on the pumps' identification plate.  (PX 48, 49, Apx 118, 153.) Lubecore's reservoir, on the other hand, bears the Lubecore name and its trademarked oil-drop-on-maple leaf logo.  The label on the reservoir is trimmed in Lubecore's signature red coloring, as is the follower plate.  Lubecore's logo also appears on the pump's stainless steel identification plate, the cap, and on the

housing.  (Transcript, RE 324, Page ID # 7992; 8558-61; PX 48, PX 50, Apx 118, 154.)

Lubecore sells its products through a network of distributors. (Transcript, RE 324, Page ID # 8583.)  Lubecore uses marketing literature to highlight the benefits of its products and to differentiate its products from competing products, including Groeneveld's.  (*Id.*, Page ID # 8578-80; DX L, DD, Apx 205, 247.)  Almost all of Lubecore's literature features its trademark and the red coloring that Lubecore uses to differentiate itself in the marketplace.  (DX K; PX 59, 63, 64, 66, Apx 208, 155, 173, 180, 194.)  Groeneveld's, on the other hand, typically features its trademark and the green coloring it uses.  (PX 3, 4, 12, 15, 16, Apx 30, 34, 46, 65, 88.)

## V.    SUMMARY OF ARGUMENT

A.    The configuration of the Groeneveld grease pump is nothing more than the sum of all of its functional parts.  For a product configuration consisting of nothing more than an overall combination of functional features, the configuration can be non-functional only if the features are combined in an arbitrary, fanciful, or distinctive way that is not influenced by engineering necessity.  Groeneveld combined the functional features of its grease pump in a nonarbitrary manner to perform an overall function, and engineering necessity influences the configuration of these functional components.   The need to

10

minimize the amount of material to house the pumps' internal parts dictates the shape of the base of the pump. The shape and size of the pumps' reservoir are dictated by the size of the base and by geometry.

B.    Although courts consider several factors in an analysis of the likelihood of confusion, in a trade dress case a strong visual impression of dissimilarity, often the result of prominent and distinctive labeling, receives the most weight.  Here, Lubecore prominently labels its pump in red, with its own trademarked logo appearing in red twice on the face of the pump.  Lubecore distinguishes its pump from the Groeneveld pump with red trim.  Moreover, Groeneveld presented absolutely no evidence at trial that even one of the sophisticated consumers of these grease pumps has actually been confused as to the origin of the Lubecore pump.

C.    The factors taken into consideration in assessing secondary meaning require a finding that the configuration of the Groeneveld grease pump has not acquired secondary meaning.  Groeneveld introduced scant, if any, consumer testimony associating the configuration of the pump with its source, plus no consumer surveys, no evidence of any significant advertising or sales in the United States, and no evidence that Lubecore intentionally copied the configuration of the pump to take advantage of the goodwill of Groeneveld rather than merely a good product design.

11

D.     Groeneveld was awarded actual lost profit damages in the amount of $1,225,000 based solely on the assumption that, but for Lubecore's infringing conduct, all of the pump sales made by Lubecore would have been made by Groeneveld.  The court had no evidence to support this assumption.  In fact, Groeneveld presented no evidence establishing a causal link even between a single Lubecore sale and even one Groeneveld lost sale.

## VI.    ARGUMENT

### A.    The Standard Of Review.

"Judgment as a matter of law [should] be granted only where a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  . . .  The grant is appropriate only if, in viewing the evidence in the light most favorable to the nonmoving party, reasonable minds could come to but one conclusion, in favor of the moving party."  *Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (internal quotations and citations omitted).  The denial of a motion for judgment as a matter of law is reviewed *de novo*.  *Barnes v. City of Cincinnati,* 401 F.3d 729 (6th Cir. 2005).

A court "may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party."  *Rush v.*

*Illinois Century R.R. Co.,* 399 F.3d 705, 727 (6th Cir. 2005). The denial of a motion for a new trial is reviewed under an abuse of discretion standard. *Tobin v. Astra Pharm. Prods., Inc.,* 993 F.2d 528, 542 (6th Cir. 1993).

### B.    The Elements Of A Trade Dress Claim.

Trade dress "is '[t]he design or packaging of a product' which has acquired a 'secondary meaning' sufficient to 'identify the product with its manufacturer or source.'" *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 547 (6th Cir. 2005) (*citing Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)). Generally, "[a] party seeking to recover for trade dress infringement must prove by a preponderance of the evidence that (1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired 'secondary meaning,' thereby indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar." *General Motors Corp. v. Lanard Toys Ltd.*, 468 F.3d 405, 414 (6th Cir. 2006) (*citing Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210 (2000)). "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 629 (6th Cir. 2002).

"Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general,

unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Allowing competitors to copy will have salutary effects in many instances. Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *Traffix*, 532 U.S. at 29 (internal citation and quotation marks omitted). "After all, copying preserves competition, which keeps downward pressure on prices and encourages innovation." *Abercrombie*, 280 F.3d at 640.

"To uphold a finding of infringement here . . . would suggest that the general appearance of almost *any* unpatented product rarely if ever could be copied faithfully. That is not the law." *Leatherman Tool Group., Inc. v. Cooper Indus.*, 199 F.3d 1009, 1011 (9th Cir. 1999) (emphasis in original).

**C.  There Was Insufficient Evidence To Submit The Issue Of Functionality To The Jury. Alternatively, The Finding That The Appearance Of The Groeneveld Pump Is Non-functional Is Against The Greater Weight Of The Evidence.**

**1.  Groeneveld Was Required But Failed to Prove That the Functional Features of Its Pump Are Configured in an Arbitrary, Fanciful or Distinctive Way And That the Configuration Was Not Influenced by Engineering Necessity.**

This is a specific type of trade dress case—a "product configuration" trade dress—because Groeneveld is seeking to protect the overall look of its pump.

14

*Abercrombie,* 280 F.3d at 630, n.4 ("product configuration" has replaced "product design").  This Court has recognized that "an overall design combination may be deserving of trade dress protection even if the individual elements are functional." *The Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003)**.**

Relying on *Traffix*, in *Antioch*, this Court recognized the distinction between the standard to assess non-functionality when the plaintiff seeks trade dress protection based on discrete elements of an overall configuration, and the standard when the plaintiff seeks trade dress protection for the overall configuration itself.  In *Traffix*, the Supreme Court addressed the non-functionality of sign stands with a spring mechanism that protected the sign in wind gusts.  The manufacturer of the signs, Marking Displays, Inc. ("MDI"), had sued Traffix Devices, Inc. ("Traffix"), which had reverse-engineered the MDI sign.  *Traffix*, 532 U.S. at 26.  MDI sought to protect the design of its stand as trade dress.

In analyzing the non-functionality of the sign stand, the Supreme Court first reiterated that the traditional test to assess the functionality of a product feature is the test in *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851, n. 10 (1982), namely that "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Traffix*, 532 U.S. at 32.

15

Applied to assess the functionality of an entire product configuration instead of a product feature, however, the *Inwood* test requires that there must be something "**arbitrary** about the components of [the] device or the way they are assembled." *Id*. at 34 (emphasis added).

Based on this test, the Supreme Court rejected MDI's trade dress claim. The trade dress MDI sought to protect consisted "simply of the dual-spring design, four legs, a base, an upright, and a sign," and there was nothing arbitrary about the way in which MDI assembled the components of the sign. *Id.* The dual-spring design "provide[d] a unique and useful mechanism to resist the force of the wind," and it was "the reason the device works." *Id.* at 33-34. Accordingly, the design was functional and MDI had failed to establish the first element of its trade dress claim.

In *Antioch*, this Court relied upon the Supreme Court's analysis in *Traffix* to hold that the overall appearance of a scrapbook album was functional. The test this Court adopted, citing *Traffix* and equally applicable here, is as follows:

> What Antioch glosses over, however, is that in order to receive trade dress protection **for the overall combination of functional features**, **those features must be configured in an arbitrary, fanciful, or distinctive way**. See *TrafFix Devices,* 532 U.S. at 34, 121 S.Ct. 1255, where the Supreme Court rejected the trade dress protection claim because the sign manufacturer "has pointed to nothing arbitrary about the

16

components of its device or the way they are assembled." In other words, **where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional**.

*Antioch*, 347 F.3d at 158 (emphasis added).  That is, "where engineering necessity **influence[s]** the configuration of the functional components," the design is functional.  *Id.* (emphasis added).

Applying this analysis, this Court held that the appearance of the scrapbook was functional because its dual strap-hinge was functional, and "where one key functional feature is the reason that the product works, whether it is a dual-spring or a dual strap-hinge, then the entire product configuration may be considered functional and not deserving of trade dress protection."  *Id*. at 159.

In so holding, this Court relied in part on the Ninth Circuit's analysis in *Leatherman*.  There, Leatherman sought to protect the overall appearance of its multi-function pocket tool, which one of its competitors, Cooper Industries, had copied.  Focusing only on the issue of functionality, the Ninth Circuit overturned a jury verdict of trade dress infringement and held instead that the district court should have granted judgment as a matter of law in favor of Cooper.  The Ninth Circuit explained its holding as follows:

> Leatherman is correct that trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to

17

result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional.

*Leatherman*, 199 F.3d at 1013 (9th Cir. 1999).   As demonstrated below, Groeneveld's argument that the overall appearance of its pump is non-functional is "semantic trickery."

> ## 2.   The Groeneveld Pump Is Nothing More Than the Sum of Its Functional Features.

The pump at issue here—one of several sold by Groeneveld—is part of an automated lubrication system that is used primarily on large, over-the-road trucks.  At timed intervals, the pump delivers bursts of grease through injectors and hoses to all of the greasing points on a truck.  The pump mechanism is housed in the base of the pump, which is made of cast aluminum.  The clear reservoir that is on top of the base holds the grease that the pump consumes.   (Transcript, RE 320, Page ID # 7882-89; PX 3, 4, Apx 30, 34.)

Groeneveld currently manufactures and sells four different kinds of ALS pumps:  the EP0 Single Line pneumatic pump at issue here, and three others.  (Transcript, RE 320, Page ID # 7998-99; PX 15-5 through 15-15, Apx 69-79.)

The Groeneveld single line pneumatic pump consists of 32 functional parts:

> (1) locking set reservoir cover;
> (2) reservoir cover;
> (3) O-ring, reservoir seal;

(4) reservoir;
(5) guide rod;
(6) pump housing;
(7) grease filter set;
(8) male stud coupling;
(9) male quick connector;
(10) dust cap;
(11) return valve;
(12) check valve;
(13) washer;
(14) blanking plug;
(15) pressure gauge;
(16) banjo coupling;
(17) follower plate;
(18) grease pressure indicator;
(19) pump housing extension;
(20) check valve;
(21) O-ring/seal;
(22) piston housing;
(23) piston return spring;
(24) O-ring with retaining ring;
(25) piston;
(26) piston seal;
(27) cylinder lining;
(28) gasket;
(29) pump housing cover;
(30) M10 spring washers;
(31) hex. socket head screw; and
(32) pressure switch 40 bar.

(PX 11-8, 11-9, Apx 43, 44.)    Groeneveld admitted that all of the parts are

functional, that no part is patented, and that every part can legally be copied.

(Transcript, RE 320, Page ID # 7984-87.)    Groeneveld's exhibits at trial

demonstrated that the "look" of its pump is nothing more than the sum of its

functional parts.  The parts are all functional, each part is there for a reason, and

they all fit together the way they do because that is how the pump works.  (PX 3, 4, 10-24, 10-25, 12-3, 14-17, 14-42, 14-43, Apx 30, 34, 39-40, 48, 59, 62-63).

> **3.    There Is Nothing Arbitrary about the Configuration of the Groeneveld Pump's Functional Features and That Engineering Necessity Influenced the Configuration of the Pump's Functional Features.**

There was no evidence that these admittedly functional features were configured in some "arbitrary, fanciful or distinctive" way to create a separately protectable trade dress in the "look" of the Groeneveld pump.  Groeneveld's witness, Willem Van Der Hulst, who was part of the team that designed the pump in the mid-1980s, provided all of Groeneveld's testimony and evidence regarding the purported non-functionality of the overall appearance or configuration of the pump.  But rather than establish non-functionality, his testimony established that there is nothing arbitrary about Groeneveld's pump's configuration and that engineering necessity influenced the configuration of the pump's functional features.  The irregularly shaped base optimizes the amount of aluminum needed to enclose the internal working parts of the pump.  The base would cost more if it had superfluous amounts of aluminum to, for example, round off the irregular shape. (Transcript, RE 320, Page ID # 7989-90.)

The size and look of the reservoir are also not arbitrary and are dictated by engineering concerns.  The volume of the cylindrical reservoir is totally determined by something other than human design, that being the amount of grease

a vehicle consumes between service intervals. (Transcript, RE 320, Page ID # 7922, 7988; RE 321, Page ID # 8019; RE 324, Page ID # 8557.) Because the base of the pump would cost more to manufacture if it were wider at the top to accommodate a reservoir with a larger diameter, engineering requirements set the diameter of the reservoir—160 millimeters—to optimize the amount of aluminum used in the base. (Transcript, RE 320, Page ID # 7992.)

Accordingly, the appearance of the reservoir has nothing to do with human design—the diameter of the base dictated the diameter, and the desired six-liter volume and simple geometry dictates the height, because base times height equals volume. Otherwise changing the size of the reservoir will affect its cost. (*Id*., Page ID # 7987-88, 7991.)

In short, not a penny more went into the look of the Groeneveld pump than was necessary to make it work as a grease pump. There is nothing ornamental about the grease pump. Ornamental features cost money, and customers purchase ornamental items based on how they look, not on how they function and how much grease they hold. Here, Groeneveld admitted that its customers purchase the pump because of how it functions, not because of how it looks. (*Id*., Page ID # 8001.)

Mr. Van Der Hulst testified that he believed both that Groeneveld wanted to make its new pump look different from its competitors' pumps, and that Groeneveld **could** have made it look different than it does and still function the

same. (*Id*., Page ID # 7925.)  He also testified that the team designing the pump showed sketches and a model of the new pump to Groeneveld's "commercial and sales" people who needed to sign off on it.  (*Id*., Page ID # 7946-7947.)  This was the only evidence that Groeneveld offered to prove non-functionality and all of it missed the mark entirely.  As a matter of law, just because a product **could** be made to look different does not mean the way it looks is arbitrary or fanciful.  And just because commercial and sales people have a say in what it is going to look like does not mean that the design for which protection is sought is non-functional. *General Motors*, 468 F.3d 405, 416 (6th Cir. 2006) (proof that the product "could have had a different appearance and still functioned the same way" is "insufficient evidence for non-functionality as the mere existence of other potential designs is no defense to a design's functionality").

Simply stated, Groeneveld presented no evidence in this case to establish what Groeneveld needed, as a matter of law, to establish: namely, that engineering did **not** influence the configuration of its pump; that Groeneveld combined the individual functional components of its pump in an arbitrary manner to perform an overall function; and that the components were configured in an arbitrary, fanciful, or distinctive way.  *Antioch*, 347 F.3d at 158.  That is the law in the Sixth Circuit.

The Ninth Circuit recently addressed the non-functionality of an industrial product in a case on all fours with this case.  In *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677 (9th Cir. 2012), the product at issue was a traction hoist "used typically for commercial building projects and external maintenance, like window washing."  *Id.* at 681.  The plaintiff sought trade dress protection in the configuration of the hoist and based its claim that the outward appearance of its hoist was non-functional on its alleged "cubist" look:

> Tractel claims that the overall exterior appearance of its hoist is nonfunctional because the hoist's design— wherein the component parts meet each other at right angles—demonstrates a "cubist" look and feel.  Its engineering manager testified that the hoist's "cube shape was part of the design look" and that the fins were supposed to be "modern" and "flashy."  Tractel touts the "singular exterior design" that sets its hoist apart from those of its competitors by presenting evidence that its hoist has "more square edges" and a "rectangular look."

*Id.* at 683.

The Ninth Circuit dismissed this argument, noting that while the "hoist has an exterior appearance, as every object must . . . there is no evidence that anything about the appearance exists for any nonfunctional purpose."  *Id.* at 684.

Consistent with this Court's analysis in *Antioch*, the Ninth Circuit held in *Secalt* that the plaintiff had failed to demonstrate anything arbitrary or ornamental about the combination of the hoist's functional features:

> Tractel's claims of its cubist visual effect are undermined by its own engineering witness who testified that numerous features of the claimed trade dress serve a function—round motors can accommodate the rotating cylindrical shaft, vertical fins can dissipate heat, and the top cap can keep water and debris from falling into the fan. **Absent is any evidence that these functional aspects of the trade dress were adorned with arbitrary, ornamental embellishments**.

*Id*. at 686 (emphasis added) (citation omitted). Likewise, the record in this case is devoid of evidence that the functional aspects of Groeneveld's pump were "adorned with arbitrary, ornamental embellishments." To the contrary, as set forth above, the irregular shape of the base results from optimizing the amount of aluminum necessary to make it, the base dictates the diameter of the reservoir, and that the desired volume dictates the height of the reservoir.

Based on the standard for non-functionality in product configuration cases as established by the Supreme Court and as applied by this Court, it is impossible to arrive at any conclusion other than (1) that the functional features of the Groeneveld pump are not "configured in an arbitrary, fanciful, or distinctive way" and (2) that "engineering necessity" influences the configuration of the pump's functional components. Accordingly, the configuration of the functional features of the Groeneveld pump is functional as a matter of law. *Antioch*, 347 F.3d at 158. Any other conclusion would mean that the configurations of all the other pumps depicted in this case would be non-functional, as would the

24

configurations of the tool in *Leatherman*, the hoist in *Secalt*, and countless other industrial widgets.  (PX 15-5, 41-44, 47, 83-84, 131-132; DX CC, Apx 69, 112-116, 196-198, 199-203, 244.)

> **D.    There Was Insufficient Evidence To Submit The Issue Of Likelihood Of Confusion To The Jury Or, Alternatively And Jointly, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence.**

As stated in *Abercrombie*, 280 F.3d at 645, "the general concept underlying the likelihood of confusion is that the public believe that the [mark or dress] owner **sponsored or otherwise approved the use of** the trademark or trade dress."  (Emphasis added.)   "The Sixth Circuit has identified eight factors as informing the likelihood of confusion inquiry: (1) strength of the plaintiff's mark, (2) relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines."  *Id.* at 646.  "These factors are not immutable, but merely indicate the need for weighted evaluation of the pertinent facts in arriving at the legal conclusion of confusion."  *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985).  In this case, nearly all of these factors weigh against finding a likelihood of confusion.

1.    **The Strong Visual Impression of Dissimilarity between the Two Pumps Itself Should Be Dispositive of This Case.**

The most critical of the *Frisch's* factors here is the lack of "similarity." Based on this Court's own precedent, the fact that Lubecore distinguishes its pump from Groeneveld's with bright red labeling bearing its trademark disposes of the issue of confusion. No one could possibly look at the two pumps and be confused as to their respective sources:

 

That is really the end of the matter.

This Court recognizes that a party whose product looks like that of another can ward off any possible confusion between the two with proper labeling, particularly labeling with its own logo or trademark. In *Abercrombie*, Abercrombie & Fitch accused American Eagle of, among other things, copying the trade dress of its clothing catalog. This Court found that there was no likelihood of confusion between the two catalogs in part because of "the ubiquitousness of the

26

producers' respective trademarks constantly indicating—on practically every page—the catalog's origin." *Abercrombie*, 280 F.3d at 648. Accordingly, based on the trademarks and the other dissimilarities between the catalogs, "[t]here [was] so little danger of a consumer picking up the two catalogs and not quickly realizing that they emanate from different sources that judgment as a matter of law for American Eagle [was] appropriate." *Id.*

In so holding, this Court stressed the importance of a "strong visual impression of dissimilarity" in the analysis of the likelihood of confusion:

> When the trade dresses are so "clearly distinguishable and would appear so to all but the most obtuse consumer," . . . that a court may resolve the issue of the dresses' similarity as a matter of law, the defendant's resounding success on this factor makes the plaintiff's burden of prevailing on the seven other Frisch's factors effectively insurmountable. **A strong visual impression of dissimilarity ordinarily "receives great weight in determining the likelihood of confusion."**

*Id.* (emphasis added) (citations omitted).

Time and again this Court and others have held that prominent, distinctive labeling is the dispositive factor in determining the likelihood of confusion. *See, e.g., Antioch*, 347 F.3d at 160 (distinctive logos and face sheets provided "sufficient signals to scrapbook buyers that [Westrim's] albums are not made by Antioch"); *Frisch's Restaurant*, 759 F.2d at 1265 ("By emphasizing 'Shoney's Big Boy Restaurants', as it did in its advertising, Shoney's has identified

27

*itself* as the source of the services.") (emphasis in original); *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 360 (3d Cir. 2007) ("[T]he prominent presence of another well-known word or design mark might be sufficient" to prevent likelihood of confusion); *Syndicate Sale, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 637 (7th Cir. 1999) ("This and other circuits have considered distinct labeling and packaging as significant factors in determining whether there is a likelihood of confusion."); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir. 1992) ("The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards eliminating any possible confusion."); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 636 (3d Cir. 1992) ("In the case of a relatively high-priced, single-purchase article . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.") (internal quotation marks omitted); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 194-95 (1st Cir. 1980) ("Each manufacturer displayed its name and logo prominently . . . , clearly identifying [the product's] origin [, so] . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.") (internal citation omitted).

28

Lubecore prominently labels its pump with its name and logo. It is hard to imagine what more it could have done in terms of prominent labeling. Lubecore has registered the following mark with the United States Patent and Trademark Office:



Lubecore's pump prominently displays this mark in red twice, once on its label and once on the identification plate. The mark is also is stamped into black surfaces in two other places on the Lubecore pump, once on the body and once on the cap. In addition, the pump features the "Lubecore red" in other locations. The follower plate is red, as is the cap on the fill fitting. (Transcript, RE 324, Page ID # 7992; 8558-61; PX 48, 50, Apx 118, 154.)

At issue in *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996), was the legal effect of clear labeling on industrial products, just like in this case. The products were "clamshell" style "starch washers" used in the corn processing industry. Fluid-Quip, at the request of some of Dorr-Oliver's customers, built a lower-priced clamshell that was "practically identical" to Dorr-Oliver's product. Dorr-Oliver claimed that Fluid-Quip had infringed the trade dress or external design of its clamshell starch washer. *Id.* at 378.

The only real distinction between the two washers was that while the Dorr-Oliver washer had a "Dorr-Oliver" nameplate and trademark on it and had "Dorr-Oliver" cast into both sides of the clamshell's outer housing, the Fluid-Quip name was "cast into all seven removable sections of [its] clamshell's outer housing and also appear[ed] on a nameplate attached to the housing." *Dorr-Oliver*, 94 F.3d at 378.

The Seventh Circuit held that Dorr-Oliver had failed to demonstrate a likelihood of consumer confusion between the two clamshells for reasons that are equally applicable here:

> Dorr-Oliver's only theory of confusion is that these potential purchasers, upon seeing the two manufacturers' names on the clamshells, will likely believe that Fluid-Quip's clamshells are affiliated with Dorr-Oliver. According to Dorr-Oliver, this will confuse the potential purchasers into having an "initial interest" in Fluid-Quip's product. Yet we fail to see why people viewing two substantially identical clamshells would leap to this conclusion. **We believe that, in the context of this industrial machine, the typical consumer will not assume that the two manufacturers are associated in some way. Rather, where product configurations are at issue, consumers are generally more likely to think that a competitor has entered the market with a similar product.**

*Dorr-Oliver*, 94 F.3d at 383 (emphasis added) (internal citation omitted).

The products at issue in *Versa Prods. Co. v Bifold Co.*, 50 F.3d 189 (3d Cir. 1995), another product configuration case, were brass valves manufactured

by Versa and Bifold. The two valves were "virtually identical in external design and *visual appearance*," and there was evidence that Bifold had copied the look of Versa's valve. *Versa*, 50 F.3d at 196 (emphasis in original).

The court analyzed the likelihood of confusion factors of product labeling, packaging, and advertising as follows:

> In a product configuration trade dress infringement case, by contrast, consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations. **Thus, in trade dress infringement suits where the dress inheres in a product configuration, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements. . . .**

Accordingly, as has this Court, the *Versa* court stressed the importance of clarity of labeling in product configuration trade dress cases:

> Indeed, except where consumers ordinarily exercise virtually no care in selecting a particular type of product (as may be the case with inexpensive disposable or consumable items . . . **clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration.**

*Versa* 50 F.3d at 202-203 (citations omitted) (emphasis added).

31

The court applied this reasoning in a very straightforward manner.  In finding no likelihood of confusion between the two valves, the court found as follows with respect to how their labeling differentiated between the two:

> **In the case of a relatively high-priced, single-purchase article . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.**  Here, the metal label bolted onto the Domino Junior valves does more than display[] the BIFOLD name.  The name appears in a logo of sorts in a font markedly different from that used in the Versa logo.  The label also contains Bifold's part number and a valve serial number, the place of origin (Wigan, England), Bifold's telephone number, and its fax number.  Moreover, this is not a case where the items are relatively inexpensive and consumers cannot be expected to examine the labels carefully, and even a quick glance at the permanently affixed label reveals that Bifold is the source of the Domino Junior valve.  **Thus, Bifold's labeling will suffice to dispel any confusion about the valve's source that the configuration of the Domino Junior valve might otherwise engender in purchasers who exercise ordinary care**.

*Versa*, 50 F.3d at 213 (internal quotes and citations omitted) (emphasis added).

Similarly, in the instant case, Lubecore's obligation was to take "reasonable and adequate steps to prevent confusion."  *Versa*, 50 F.3d at 213.  It did so.  Groeneveld's witness Orville Wright, a consumer of Groeneveld pumps, admitted as much when he testified that he could identify the Lubecore pump by its label:

> Q.    Do you see a Lubecore pump in the courtroom today?

> A.    I see two pumps sitting there, and one of them has Lubecore on it and the other has Groeneveld.  And I'm assuming the one Lubecore pump **label** is a Lubecore.

(Transcript, RE 321, Page ID # 8203, emphasis added.)  Similarly, Groeneveld's Kees Wapanaar testified that he didn't "think you need to have 20-20 vision to see that there are differences" between the two pumps.  (*Id*., Page ID # 8105.)  And Jan Eisses of Lubecore testified at length about the visual differences between the two pumps. (RE 324, Page ID#8558-8562.)

The Groeneveld and Lubecore pumps display a "strong visual impression of dissimilarity" between them, and this dissimilarity "receives great weight in determining the likelihood of confusion." *Abercrombie*, 280 F.3d at 648

### 2.    There Was No Evidence of Actual Confusion.

Groeneveld presented no evidence of actual confusion by consumers of Lubecore pumps—no evidence that any actual consumer of a Lubecore pump was ever confused as to the source or origin of the pump.  In fact, the evidence was 180 degrees to the contrary.  Dean Osborn was the only witness who had actually purchased a Lubecore pump.  His testimony was unequivocal that he knew exactly what he was purchasing and was not confused in any way, shape, or form as to its origin, even though he had previously purchased the Groeneveld pump:

> Q.    And you understand from your experience buying these different products with Fuel Systems that they are an independent distributor?

A.   Correct.

Q.   Not the manufacturer of these products?

A.   Correct.

Q.   **All right.  Thank you.  When you bought the four Lubecore systems, it was clear to you that you were buying Lubecore systems, not Groeneveld systems, correct?**

A.   **Correct**.

Q.   Garvin has told you as much himself?

A.   Um-hum, yes.

Q.   And the product has got Lubecore's label on it more than one place, right?

A.   Yes.

Q.   And you said you were given some Lubecore marketing materials?

A.   Yes.

Q.   **So there was no confusion on your part about whose product you were buying?**

MS. MICHELSON:  Objection.

THE WITNESS:  **Correct.**

(RE 173,Osborn Trial Dep. at 53-54, emphasis added.)

In short, Groeneveld presented no evidence of any actual consumer confusion, and it is practically impossible that it could have.  To paraphrase *Dorr-Oliver*, 94 F.3d at 381, Lubecore holds itself out to this market as a competitor of Groeneveld and conspicuously marked its pumps with its company name.  Clearly,

34

any purchasers of automated lubrication pumps would know from whom they were buying.  There is therefore no realistic possibility that anyone would purchase a Lubecore pump believing it to be a Groeneveld pump.

### 3. Purchasers of Automated Lubrication Systems Are Sophisticated Consumers Who Take Great Care in Selecting which Product to Buy.

The sophistication of the consumer "takes on enhanced importance when a claim is made for infringement of trade dress in a product configuration," and the question is whether a sophisticated customer exercising ordinary care would "be confused as to the sources of substantially identical products."  *Versa Prods.*, 50 F.3d at 204.  *See also Dorr-Oliver*, 94 F.3d at 381 ("the likelihood of confusion must be determined with reference to the realities of consumer behavior in the relevant market").

The process by which Groeneveld, Lubecore and other competitors sell automated lubrication systems underscores the sophistication of the customer base for these products. These pumps are not consumer items plucked off a shelf, and they are not available in stores.  Both companies use distributors to sell their pumps.  And there is almost no way a customer could walk into a distributor and see the pumps side by side, because Groeneveld's distributors are exclusive to Groeneveld.  (Transcript, RE 321, Page ID # 8061, 8099.)

The sales process is much more complex than that. Groeneveld's Kees Wapenaar, for example, has to carry around a cut-away pump on his sales calls to explain what his product is in the first place. (Transcript, RE 321, Page ID # 8031-32; PX 19, Apx 111.) Consummating a sale typically requires a number of sales calls, with the potential customers weighing the benefits and costs of going the automated lubrication route. (Transcript, RE 321, Page ID # 8100-8101; RE 324, Page ID # 8583-85.) Potential customers are typically given product literature to review or given presentations about the products, literature and presentations that clearly identify the product. Almost all of Lubecore's literature features its trademark and the red coloring that Lubecore uses to differentiate itself in the marketplace. (DX K; PX 59, 63, 64, 66, Apx 208, 155, 173, 180, 194.) Groeneveld's, on the other hand, typically features its trademark and its green coloring. (PX 3, 4, 12, 15, 16, Apx 30, 34, 46, 65, 88.) Moreover, in making its sales pitches, Lubecore relies on fact sheets that inform the customer of the *differences* between its pump and those of its competitors—including Groeneveld—that it believes make its pump superior to all others. (Transcript, RE 324, Page ID # 8578-80; DX L, DD, Apx 205, 247.) And, of course, as discussed above, the pumps themselves are clearly identified as to their source by their labeling.

The issue of the sophistication level of the consumers in the market for automated lubrication systems has already been litigated and decided.   In rejecting a claim by Bijur Lubricating Corp. that Devco Corp., a competitor in the automated lubrication systems market, was diluting Bijur's registered trademark by using the Bijur trademark on Devco's website to promote the sale of Bijur component parts, the court held:

> The commercial purchasers with whom the companies do business can be expected to understand the market. Devco's website did not suggest that it was affiliated with or an authorized distributor of Bijur.

*Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722, 732 (D. N.J. 2004).

The court further explained:

> Both Bijur and Devco deal exclusively with commercial purchasers . . . It is reasonable to expect these purchasers to be relatively sophisticated about the market and careful in their purchasing decisions.

(*Id.* at 729.)  The *Bijur* court was talking about the exact same customer base that is at issue in this case—purchasers who are sophisticated about the market and careful in their purchasing decisions.  This is not a customer base that would likely be fooled by pieces of industrial equipment that look that same but which are clearly labeled as being different and which are sold through different distribution channels.

**4.      There Was No Evidence That Lubecore Intended to Confuse or Deceive Anyone Regarding the Source or Origin of Its Pump.**

The district court's analysis of the "intent to copy" factor is challengeable because the court ignored Supreme Court and other precedent regarding the application of this factor in product configuration trade dress cases, especially those involving industrial products.

In addressing the "inherent distinctness" factor of secondary meaning in *Wal-Mart*, the Supreme Court recognized that "product design almost invariably serves purposes other than source identification."  *Wal-Mart*, 529 U.S. at 213.  In other words, consumers do not rely on the configuration of the product to identify the source of the product:

> In the case of product design, as in the case of color, **we think consumer predisposition to equate the feature with the source does not exist**.  Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.

*Id.* (emphasis added).

Accordingly, the factor of the defendant's intent in copying an industrial product is given little weight in trade dress cases involving product configuration because copying can itself foster competition:

> Where product configurations are concerned, we must be especially    wary    of    undermining    competition.

38

> Competitors have broad rights to copy successful product designs when those designs are not protected by (utility or design) patents. **It is not unfair competition for someone to trade off the good will of a product . . . it is only unfair to deceive consumers as to the origin of one's goods and thereby trade off the good will of a prior producer**.

*Versa*, 50 F.3d at 207 (emphasis added). Accordingly,

> in a product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion **only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading**.

*Id.* at 208 (emphasis added). The *Versa* court did not consider Bifold's intent because Bifold's identification of its valves was not misleading. *Id.* at 209. Similarly, even though it was undisputed that the defendant in *Dorr-Oliver* had intentionally copied his competitor's product, its labeling was sufficient to distinguish the two because "in the case of a high-priced, single-purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product." *Dorr-Oliver*, 94 F.3d at 383.

In denying Lubecore's Rule 50/59 motion, the district court put too much emphasis on the "intent to copy" factor in its analysis of the likelihood of confusion. Mr. Eisses had sold the Groeneveld pump for years, both as an independent distributor and as an employee. (Transcript, RE 324, Page ID # 8528-31; 8539-8541.) In Mr. Eisses' assessment, the Groeneveld pump was the best on

39

the market at the time, but when he went about having a new pump designed for Lubecore, his goal was to improve on the Groeneveld pump—*as a pump*—based on his years of experience in the industry.  (*Id.*, Page ID # 8540-41, 8552-56; 8604.) He didn't care if his pump looked like the Groeneveld pump because all he wanted was a durable product that pumped grease and satisfied the needs of his customers.  (*Id.*, Page ID # 8556.)  And then rather than attempting to deceive customers as to the pump's origin, the evidence is that Lubecore wants people to buy its pump because it is a Lubecore product.   As set forth above, Lubecore clearly displays its name and logo on its pump.  Lubecore clearly identifies the source of its pump, and there is nothing whatsoever that is misleading about that labeling.  Moreover, as set forth above, in marketing its pump, Lubecore makes every effort to **distinguish** its brand from Groeneveld's and to tout the benefits of its pump over Groeneveld's.  Lubecore's intent—rather than to trade off the good will of Groeneveld—is to distinguish itself in the marketplace and create its own brand.  (*Id.*, Page ID # 8575-80.)  This is the definition of competition, not confusion.

5.    **Groeneveld Presented No Evidence That Consumers Rely on the Pump's Configuration to Identify It as a Groeneveld Pump.**

Demonstrating the strength of the trade dress in a product configuration case requires proof that *consumers* rely on the configuration to identify the *source* of the product:

> Yet strength of a product configuration must mean more than the *ability* of large numbers of consumers to identify the configuration as coming from a particular producer. . . .

> Rather, "strength" of product configuration as relevant to determining likelihood of confusion on the part of ordinarily careful consumers should be found only if consumers *rely* on the product's configuration to identify the producer of the good.

*Versa*, 50 F.3d at 203 (emphasis in original). This is so because in the "industrial design context . . . product appearance typically plays a lesser role in buyers' selection processes." *Id*. at 204.

Here, although it might be the case that some consumers have the ability to look at the pump from a distance and recognize it, there was absolutely no evidence that consumers of automated lubrication systems *rely* on the configuration of the Groeneveld pump to identify its producer, as opposed to its label. The undisputed evidence was that consumers of automated lubrication systems do not make their choice based on the "look" of the product. They do not rely on the look of the Groeneveld pump and pick it off a shelf stocked with other

41

pumps. Rather, as set forth above, the sales process is a lengthy, complex process involving many sales visits, the exchange of literature, and the analysis by the customer of the benefits and costs of the product.

### 6. Lubecore And Groeneveld Do Not Typically Market Their Pumps through the Same Channels.

The "marketing channels" used factor is of extremely limited significance in the analysis of likelihood of confusion in product configuration trade dress cases. Proof that the products are sold through the same marketing channels is necessary to establish likelihood of confusion, but not sufficient to do so. *Versa*, 50 F.3d at 208.

Here, while Groeneveld and Lubecore do sometimes attend the same industry trade shows, there was no evidence that they otherwise market their automated lubrication systems through the same marketing channels. In fact, the evidence was to the contrary. Although both Groeneveld and Lubecore sell their pumps primarily only to distributors, Groeneveld's distributors must agree to deal exclusively with Groeneveld. (Transcript, RE 321, Page ID # 8061, 8099.) This exclusivity precludes the possibility that a distributor could be selling both Groeneveld and Lubecore automated lubrication systems and thus contributing to the possibility of confusion.

### 7.    The Relatedness of the Pumps Is Entirely Offset by Lubecore's Distinct Labeling And Marketing.

The grease pumps at issue here are related in that they both serve as the mechanism through which grease is fed to a vehicle's greasing points.  As set forth above, however, (1) the distinctive labeling on the Lubecore pump distinguishes it from the other pumps on the market; and (2) Lubecore strives to distinguish its brand from the competition in various ways.  That there was no evidence of actual confusion in this case demonstrates that Lubecore is succeeding in distinguishing its pump and brand, despite the obvious similarities between the configurations of the Lubecore and Groeneveld pumps.

### 8.    There Was No Evidence Relating to the Likelihood of Either Party Expanding Its Product Lines.

There was no evidence presented at trial regarding the factor of expansion of product lines and so this factor does not favor either party.

### E.    There Was Insufficient Evidence To Submit The Issue Of Secondary Meaning To The Jury Or, Alternatively, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence.

Secondary meaning occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Inwood Labs.,* 456 U.S. at 851, n.11.  The Sixth Circuit uses a seven-factor test to assess whether a trade dress has secondary meaning:  (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of

use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *General Motors*, 468 F.3d at 418.

Most of these factors do not support a finding of secondary meaning here. The Sixth Circuit "has historically favored the use of consumer surveys as proof of secondary meaning." *General Motors*, 468 F.3d at 419. Groeneveld, however, produced no survey. Similarly, at most two actual pump consumers testified that they recognized the pump by its configuration (Transcript, RE 321, Page ID # 8124; Page ID # 8199.) Both, however, are longtime users of the Groeneveld pump, and one would expect that they could recognize it without its label (and, furthermore, both acknowledged they were not confused about what pump they were looking at due to clear labeling). (Transcript, RE 321, Page ID # 8115; Page ID # 8190-91; Page ID # 8124; Page ID #8203.)

The advertising and sales figures offered by Groeneveld were meaningless for several reasons. First, they pertain not only to Groeneveld, but also include other Groeneveld entities that are not parties to this case. (Transcript, RE 323, Page ID # 8385-8389.) Second, Groeneveld did not provide any context within which the jury could reasonably assess the relative size of the expenditures or sales. They are meaningless absent information regarding the same costs incurred and sales made by Groeneveld's competitors. Third, there was no was

indication that Groeneveld directed any of its advertising at establishing a link between the configuration of the Groeneveld pump and its source.   Although Groeneveld's sales literature prominently features pictures of the pump, all of the pictures are of the pump with its green labeling and green Groeneveld logo, rather than the bare configuration of the pump alone.   (*See, e.g.*, PX 3, 4, 15, 16.) *Tenneco Auto. Operating Co. v. Kingdom Auto Parts*, 2010 U.S. Dist. LEXIS 22571, *27-28 (6th Cir. Oct. 28, 2010) (advertising must be directed to connecting the trademark with its identification as the source of the product).

Finally, again, "product-design trade dress can never be inherently distinctive" (*Wal-Mart*, 529 U.S. at 214) and, therefore, "secondary meaning for any product design trade dress cannot be inherent through evidence of copying." *General Motors*, 468 F.3d at 419.   "Intentional copying may be used to show secondary meaning as the seventh factor in this Court's seven-factor test, but it is only one of many considerations in that test and does not alone establish secondary meaning." *Id.*

Here, even assuming that Lubecore did copy the configuration of the Groeneveld pump, as set forth above, there was no evidence that Lubecore did so other than because the Groeneveld pump was a good pump that Lubecore maintains it improved upon.   No one who had intentionally copied the Groeneveld pump and had planned on capitalizing off of the look of that pump because of its

secondary meaning would have then wholly undercut these efforts by trimming and labeling the new pump in red, rather than the Groeneveld green, which is the most prominent feature of the look of the Groeneveld pump. Put another way, that Lubecore trims and labels its pump in red (with its own trademarked logo), rather than green, means that Lubecore does not intend to capitalize on the secondary meaning of the configuration of the Groeneveld pump. Copying can foster competition, and it is not unfair for a producer to trade off the good will of a competitor's product itself. It is only unfair to trade off the good will of the **competitor**. *Versa*, 50 F.3d at 207.

F.    **Lubecore Is Entitled To Judgment As A Matter Of Law, Or Alternatively, A New Trial Regarding Groeneveld's Damages For Lack Of Any Evidence Of A Causal Link To Lubecore's Alleged Infringement And Because Groeneveld's Damages Theory Was Speculative.**

1.    **Groeneveld Was Awarded Actual Lost Profits, Not Disgorgement of Lubecore's Profits.**

A plaintiff who proves a trade dress infringement claim has two alternative measures of damages: "defendant's profits" or "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). In denying Lubecore's Rule 50/59 Motion, the district court held that the $1,225,000 damages award to Groeneveld "could consist of Groeneveld's lost revenues or Defendant's profits, or some other combination." (Mem. Op. and Order, RE 280, Page ID # 7055.) The district court erred in so holding, because there is no question that Groeneveld sought—and was

awarded—its claimed actual lost profit damages rather than disgorgement of Lubecore's profits.

First, Groeneveld repeatedly described its damages calculation—totaling $1.225 million—to the jury at trial as Groeneveld's "lost profits" based on its "lost sales" to Lubecore. (Transcript, RE 322, Page ID # 8335-36; RE 323, Page ID # 8365-66; 8377-78; 8418.) Groeneveld calculated its lost profits by deriving its profit or "contribution margin" and then applying this profit margin to all of Lubecore's sales, based on the faulty assumption that Groeneveld would have made every sale that Lubecore made but for Lubecore's infringement. (Transcript, RE 323, Page ID # 8352-55, 8369-8374; 8440-41; PX 103, Apx 259.) Groeneveld's key damages witness, Gail Wilson, testified as follows regarding Groeneveld's actual lost profits:

> Q.   And can you just tell the jury please what the total number is in terms of the lost sales damages to Groeneveld?
>
> A.   The contribution margin on the sales lost over the three year period is $1,225,627.00.

(*Id*., Page ID # 8377-78.)

Second, in its judgment entry the district court acknowledged that Groeneveld had been awarded its actual lost profit damages rather than disgorgement of Lubecore's profits when it set a deadline for Groeneveld to file a motion seeking for treble damages. Such a motion is authorized under 15 U.S.C.

§ 1117(a) only with respect to an award of damages.   (Judgment Entry, RE 229, Page ID # 5641.)

Finally, even Groeneveld admits that the Court awarded actual lost profit damages rather than disgorgement of Lubecore's profits.   After the trial Groeneveld moved for enhanced damages under the Lanham Act, 15 U.S.C. §1117(a), which as a matter of law it could do only with respect to actual damages sustained.   In that motion, Groeneveld sought treble damages of $4.9 million, or four times $1,225,000.[1]   (Motion for Enhanced Damages, RE 237, Page ID # 5991.)  Groeneveld represented to the court that "Groeneveld's $1.225 lost sales calculation was conservative . . . and Groeneveld sustained harm over and above that which can be captured in the $1.225 million damages verdict." (*Id*., RE 237-1, Page ID # 6001.)

In opposing Lubecore's Rule 50/59 Motion, Groeneveld suddenly retreated from its trial testimony and its own motion for enhanced damages and claimed that "record evidence supports the jury's damages award – as either the amount of Groeneveld's lost revenues or the amount of Defendant's lost profits." (Groeneveld Opp. to Rule 50/59 Mot., RE 256, Page ID # 6554.)  As noted above,

---

[1]      The Sixth Circuit interprets §1117(a) as permitting the court to increase the damages award by an additional three times the amount assessed as the plaintiff's actual damages. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F. 3d 1185, 1191 (6th Cir. 1997).

the district court accepted this argument and even chided Lubecore for not having objected to the verdict form.  (Mem. Op. and Order, RE 280, Page ID # 7055.) There was no need to.  The form asked if the jury was going to "award damages," not "defendant's profits," or some combination of the two.  (Verdict, RE 224, Page ID # 5627.)  Groeneveld's disingenuous shift from actual damages to lost profits was made for only one reason, to circumvent the causation requirement that Groeneveld knows it failed to prove.

### 2. There is No Causal Link Between Groeneveld's Claimed Lost Profits Damages and Lubecore's Alleged Trade Dress Infringement.

Actual damages in Lanham Act actions are governed by the law of damages in tort actions.  *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F. 2d 1232, 1235 (6th Cir. 1991).  Under general tort principles "the infringer-tortfeasor is liable for all injuries caused to plaintiff by the wrongful act, whether or not actually anticipated by the defendant." *Id.*  However, in Lanham Act cases, courts draw a sharp distinction between proof of the **fact** of damages and proof of the **amount** of damage.  *Id.*  To be entitled to damages the plaintiff must first prove that "some damages were the certain result of the wrong." *Id.* (*quoting Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F. 2d 738, 745 (7th Cir. 1986).  Damages are precluded where the damage claimed is not the certain result of the wrong.  *Id.*

(*quoting Grantham and Mann, Inc. v. American Safety Prods.*, 831 F. 2d 596, 601-02 (6th Cir. 1987).

Here, Groeneveld failed to introduce any evidence whatsoever of a causal link between Lubecore's sales and marketing of its pump and Groeneveld's claimed damages. Instead, its damages calculation assumed that Groeneveld would have made every sale Lubecore made. (Transcript, RE 323, Page ID # 8369, 8440-41.) There is no support for this assumption in the record, nor in logic or reason.

Groeneveld introduced two witnesses at trial who addressed the issue of damages. The first was Gail Wilson. Ms. Wilson acknowledged that the slight dip in Groeneveld's sales could have resulted from many economic factors wholly unrelated to Lubecore:

> There are many influences that go into [Groeneveld's dip in sales.] For certain, for sure, part of it is just the drop in the marketplace with the hit of the lack of financing and the tightness in the capital markets meant that some of our customers were unable to purchase systems or lack of confidence, you know, just the general economic down turn . . . .

(*Id.* Page ID # 8341-42; *see also* 8388-89.) Despite these acknowledgements, Ms. Wilson did not make any adjustments to her damages theory for **any** factor that could have influenced lost sales other than Lubecore as a new market entrant. The second witness was Dr. John Burke. Dr. Burke admitted that Groeneveld asked

him to assume that Groeneveld would have made every sale made by Lubecore and that he had no knowledge whatsoever relevant to the issue of causation. Dr. Burke testified that if there was no evidence that even one sale made by Lubecore would otherwise have been made by Groeneveld, then Groeneveld's damages were "probably zero." (*Id.*, Page ID # 8489-92.)

Moreover, there was no evidence of even a single sale that Groeneveld lost because a confused customer bought a Lubecore pump and thought he was buying a Groeneveld pump. Dean Osborn—the only purchaser of a Lubecore pump that testified at trial—testified unequivocally that he knew in advance of his purchase that he was getting a Lubecore, and he was not confused. (RE 173, Osborn Trial Dep. at 53-54.)[2] There was absolutely zero evidence that any of Groeneveld's claimed actual lost profit damages were the **certain result** of the alleged wrong (customer confusion caused by violating Groeneveld's trade dress.)

This Court's decision in *Jeffrey Chain, L.P., v. Tropodyne Corp.*, 2000 U.S. App. LEXIS 33926 (Dec. 20, 2000), is directly on point. There, the defendant—a former employee and new competitor of the plaintiff's—appealed a

---

[2]    The October 7, 2011 videotaped deposition of Steve Osborn was played to the jury in Plaintiff's case (Transcript, RE 322, Page ID # 8279), on June 11, 2012 Plaintiff submitted a copy of the videotape to the Court for inclusion in the record. Plaintiff had previously filed the written transcript of this deposition as RE 173.

jury verdict and partial summary judgment ruling in the plaintiff's favor in a trademark infringement case. After the verdict, the defendant unsuccessfully sought judgment as a matter of law on the grounds that (1) there was no evidence of a causal link between his sales and the claimed damages, and (2) plaintiff's damages theory (based on lost sales and lost growth opportunities) was speculative. *Id.* at *13-15. This Court reversed the district court's denial of the Rule 50 motion, concluding that the damages plaintiff attributed to defendant were "purely speculative" and that there was insufficient evidence of causation. *Id.* at *19. In reaching its conclusion, the Sixth Circuit observed:

> [Plaintiff's] damages theory assumes that its decline in sales was caused exclusively by [defendant's] actions. The assumption of causation, however, was not supported by the trial record. . . . [plaintiff's] damages calculation did not take into consideration any relevant factors other than [defendant's] allegedly infringing activity that might have accounted for its lost sales, such as the consolidation of competitors, the activities of its competitors, the trend[s] in the industry . . . .[plaintiff] produced no direct evidence that its lost profits were attributable to [defendant]. Neither did it produce any direct evidence of consumer confusion. The only testimony regarding confusion was conjecture by [plaintiff's] officers. . . . [Plaintiff] did not present evidence of a single job lost to [defendant.]

*Id.* at *15-*17. Citing *Broan Mfg., supra*, the Sixth Circuit reasoned that "because [plaintiff] was unable to show loss of a single sale caused by [defendant], it cannot validly attribute any of its losses to [defendant], much less all of its losses," and

has made "no showing that its damages were the 'certain result' of [defendant's] alleged wrong." *Id.* at \*18-19; *see also Shoreline Dev., Inc. v. Cendant Corp.*, 2002 U.S. Dist. LEXIS 7836, at \*9-10 (N.D. Ohio April 23, 2002) (finding that plaintiff did not make a sufficient showing that it suffered any actual damages as a result of defendant's acts).

Notwithstanding the complete lack of evidence of a causal link between Lubecore's alleged infringement and Groeneveld's claimed damages, the jury returned a verdict of $1,225,000 in Groeneveld's favor by applying Groeneveld's profit margin against all of Lubecore's actual and projected sales in the United States, whether they were of the EP-0 pump or some other pump. As discussed above, the verdict exactly matched Ms. Wilson's damages calculation.

### 3. Groeneveld's Claimed Lost Profits Damages Are Speculative and, Therefore, Not Recoverable.

Additionally, Groeneveld's damages calculation was speculative. It is elementary that damages that are remote or speculative are not recoverable. *Agric. Servs. Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977); *see also Baumer v. Franklin County Distilling Co.*, 135 F.2d 384, 390 (6th Cir. 1943) (Ohio law does not permit recovery of speculative damages). First, and most egregiously, Ms. Wilson based her damages calculation on Lubecore's **projected** sales numbers for part of 2010 and all of 2011, which grossly exceeded Lubecore's actual sales numbers. (PX 103, Apx 259; Transcript, RE 325, Page ID 8708-

8712.)  Lubecore produced these projected sales numbers prior to the preliminary injunction hearing in October of 2010.  Lubecore updated them with **actual** sales numbers prior to the trial, which occurred a year later.  (DX X, Apx 260.)  Second, as mentioned previously, Ms. Wilson based her damages calculation on her conjecture that Groeneveld would have made **every** sale Lubecore made.  There was simply no evidence of any causal link between Lubecore's sales and its allegedly infringing conduct.  Every purchaser of a Lubecore pump could have done so fully aware that it was a Lubecore pump and without having made any association whatsoever with Groeneveld.  In fact, every purchaser of a Lubecore pump, except for Dean Osborn, could have done so without even knowing about Groeneveld.

## VII.  CONCLUSION

For all of the foregoing reasons, Appellant asks this Court to vacate the judgment of the district court, and enter final judgment in favor of Appellant, or in the Alternative and Jointly, order a new trial.

Respectfully submitted,

    /s/ Melissa L. Zujkowski
Thomas L. Anastos  (0043545)
Melissa L. Zujkowski (0078227)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile:  (216) 583-7001
tanastos@ulmer.com
mzujkowski@ulmer.com

Counsel for Appellant
Lubecore International, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the type style requirements of Fed. R. App. P. 32(a)(6) because:   this brief contains 12,081 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman style.

      /s/ Melissa L. Zujkowski
Counsel for Appellant
Lubecore International, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2012 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.


    /s/ Melissa L. Zujkowski
Counsel for Appellant
Lubecore International, Inc.

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The Defendant-Appellant designates the following relevant District Court documents, all of which are part of the District Court's electronic record.

| **Record Entry** | **Document Description** | **Page ID Range** |
| --- | --- | --- |
| 1 | Complaint | 1-14 |
| 4 | Motion for Preliminary Injunction | 41-44 |
| 88 | Memorandum Opinion & Order | 2054-2055 |
| 173 | Deposition of Dean Osborn pp. 53-54 | 4399-4400 |
| 223 | Minutes of Proceedings | 5626 |
| 224 | Verdict | 5627 |
| 229 | Judgment Entry | 5641 |
| 237 | Motion for Enhanced Damages | 5991, 6001 |
| 242 | Motion for JMOL or in the Alternative New Trial | 6238-6266 |
| 256 | Opposition to Motion for JMOL | 6554 |
| 279 | Order of Permanent Injunction | 7043-7044 |
| 280 | Memorandum Opinion and Order Denying Defendant's Motion for JMOL and For New Trial | 7055 |
| 281 | Memorandum Opinion and Order Granting Plaintiff's Motion for Attorneys Fees and Prejudgment Interest Denied | 7059-7061 |

| **Record Entry** | **Document Description** | **Page ID Range** |
|---|---|---|
| 283 | Memorandum Opinion and Order Denying Plaintiff's Motion for Enhanced Damages | 7069-7071 |
| 320 | Transcript of Jury Trial held on October 13, 2011 | 7882-7889, 7992, 7925, 7946-7947, 7987-7992, 7998-7999, 8001 |
| 321 | Transcript of Jury Trial held on October 14, 2011 | 8011-8014, 8018-8019, 8021-8022, 8031-8032, 8061, 8099, 8100-8101, 8105, 8115, 8124, 8190-8191, 8199, 8203 |
| 322 | Transcript of Jury Trial held on October 17, 2011 | 8335-8336 |
| 323 | Transcript of Jury Trial held on October 18, 2011 | 8341-8342, 8352-8355, 8365-8366, 8369-8374, 8377-8378, 8385-8389, 8418, 8440-8414, 8489-8492 |
| 324 | Transcript of Jury Trial held on October 19, 2011 | 8528-8531, 8539-8541, 8546-8547, 8550-8564, 8578-8580, 8583-8585, 8604, 8646-8664 |
| 325 | Transcript of Jury Trial held on October 20, 2011 | 8667-8681, 8708-8712, 8740-8763 |

| **Record Entry** | **Document Description** | **Page ID Range** |
| --- | --- | --- |

Trial Exhibits

Plaintiff's Exhibits
PX 3, 4, 10-24, 10-25, 11-8, 11-9, 12, 12-3, 14-17, 14-42, 14-43, 15, 16, 19, 41-44, 47 48, 49, 50, 59, 63, 64, 66, 83-84, 103

Defendant's Exhibits
K, L, X, CC, DD