Case No. 12-3545/3576

# United States Court Of Appeals
# For The Sixth Circuit

GROENEVELD TRANSPORT EFFICIENCY, INC.,

Plaintiff – Appellee Cross-Appellant,

vs.

LUBECORE INTERNATIONAL, INC.,

Defendant – Appellant Cross-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

---

**APPELLANT/CROSS-APPELLEE LUBECORE
INTERNATIONAL, INC.'S REPLY BRIEF ON APPEAL
AND RESPONSE BRIEF**

---

Thomas L. Anastos  (0043545)
Melissa L. Zujkowski (0078227)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile:  (216) 583-7001
tanastos@ulmer.com
mzujkowski@ulmer.com

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

I.    INTRODUCTION ........................................................... 1

II.   REPLY ARGUMENT IN SUPPORT OF APPEAL ...................................... 2

    A.    There Was Insufficient Evidence To Submit The Issue Of Functionality To The Jury.  Alternatively, The Finding That The Appearance Of The Groeneveld Pump Is Non-functional Is Against The Greater Weight Of The Evidence .................................... 2

    B.    There Was Insufficient Evidence To Submit The Issue Of Likelihood Of Confusion To The Jury Or, Alternatively And Jointly, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence .............................. 12

        1.    Groeneveld Failed to Request a Jury Instruction Regarding The Presumption of Confusing Similarity That Can Arise from Evidence of Intentional Copying. ................. 12

        2.    The Strong Visual Impression of Dissimilarity between the Two Pumps Itself Should Be Dispositive of This Case..... 14

        3.    Purchasers of Automated Lubrication Systems Are Sophisticated Consumers Who Take Great Care in Selecting which Product to Buy................................ 23

    C.    There Was Insufficient Evidence To Submit The Issue Of Secondary Meaning To The Jury Or, Alternatively, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence .................................................. 27

    D.    Lubecore Is Entitled To Judgment As A Matter Of Law, Or Alternatively, A New Trial Regarding Groeneveld's Damages For Lack Of Any Evidence Of A Causal Link To Lubecore's Alleged Infringement And Because Groeneveld's Damages Theory Was Speculative.................................................. 27

i

1. Lubecore Preserved Its Damages Argument for Appeal ......... 27

2. Groeneveld Was Awarded Actual Lost Profits, Not Disgorgement of Lubecore's Profits ......................................... 29

3. There is No Causal Link between Groeneveld's Claimed Lost Profits Damages And Lubecore's Alleged Trade Dress Infringement ................................................................. 32

III. ARGUMENT IN OPPOSITION TO GROENEVELD'S APPEAL ............ 37

A. The District Court Properly Dismissed Groeneveld's Unfair Competition And Ohio Deceptive Trade Practices Act Claims ......... 37

B. The Permanent Injunction—If Allowed To Stand—Is Properly Limited To The United States ............................................ 41

IV. CONCLUSION ................................................................. 51

Certificate of Compliance ......................................................... 52

Certificate of Service ................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
　　280 F.3d 619 (6th Cir. 2002)........................................................ 14, 15

*Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*,
　　955 F. Supp. 220 (S.D.N.Y.1997).........................................................49

*Aerogroup, Int'l, Inc. v. Marlboro Footworks, Ltd.*,
　　1998 U.S. App. LEXIS 7733 (Fed. Cir. 1998) ....................................48

*Amer. Rice, Inc. v. The Arkansas Rice Growers Co-op Ass'n*,
　　701 F.2d 408 (5th Cir. 1983)..................................................................48

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A*,
　　126 F. Supp. 2d 328 (S.D.N.Y. 2001)............................................ 45, 47

*Benaugh v. Ohio Civil Rights Comm'n*,
　　278 Fed. Appx. 501 (6th Cir. 2008).....................................................29

*Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*,
　　923 F. 2d 1232 (6th Cir. 1991)...............................................................33

*Carroll v. Renico*,
　　475 F.3d 708 (6th Cir. 2007)....................................................................4

*Cesare v. Work*,
　　36 Ohio App. 3d 26 (Ohio App. 9th Dist.1987) ................................38

*Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan*,
　　449 F.3d 688 (6th Cir. 2006).....................................................................4

*City of Sterling Heights, Mich. v. United Nat. Ins. Co.*,
　　319 Fed. Appx. 357 (6th Cir. 2009)....................................................13

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*,
　　109 F.3d 275 (6th Cir. 1997)........................................................ 23, 24

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
  94 F.3d 376 (7th Cir. 1996)..................................................................... 16, 17, 24

*Ford Motor Co. v. Lloyd Design Corp.*,
  184 F. Supp. 2d 665 (E.D. Mich. 2002)...........................................................29

*Frisch's Restaurant v. Shoney's, Inc.*,
  759 F.2d 1261 (6th Cir. 1985) ....................................................... 15, 16, 26, 28

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
  111 F.3d 993 (2d Cir. 1997)...........................................................................48

*General Motors Corp. v. Lanard Toys Ltd.*,
  468 F.3d 405 (6th Cir. 2006)..................................................................... 4, 10

*George Basch Co., Inc. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992).........................................................................50

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*,
  423 F.3d 539 (6th Cir. 2005).........................................................................21

*Hartford Fin. Servs. Group, Inc.*,
  168 Fed. Appx. 26 (6th Cir. 2006)..................................................................28

*Joe v. United States*,
  510 F.2d 1038 (10th Cir. 1975) ..................................................................... 13

*Jeffrey Chain, L.P., v. Tropodyne Corp.*,
  238 F.3d 421 (6th Cir. 2000)..................................................................... 34, 35

*Le Ballets Trockadero de Monte Carlo, Inc. v. Trevino*,
  945 F. Supp. 563 (S.D.N.Y. 1996) ............................................................. 46, 48

*Leatherman Tool Group, Inc. v. Cooper Indus.*,
  199 F.3d 1009 (9th Cir. 1999) .......................................................................12

*Libbey Glass, Inc. v. Oneida Ltd.*,
  61 F. Supp. 2d 700 (N.D. Ohio 1999)....................................................... *passim*

*Liberty Toy Co. v. Fred Silber Co.*,
  1998 U.S. App. LEXIS 14866 (6th Cir. 1998) .................................................48

*Makers Mark Distillery, Inc. v. Diageo North Amer., Inc.*,
  679 F.3d 410 (6th Cir. 2012)..........................................................................15

*Mertik Maxitrol GMBH & Co. v. Honeywell Technologies Sarl*,
  No. 10-12257, 2012 WL 748304 (E.D. Mich. March 6, 2012) ................... 11, 48

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
  316 U.S. 203 (1942) .....................................................................................36

*Paulsson Geophysical Servs., Inc. v. Sigmar*,
  529 F.3d 303 (5th Cir. 2003)..................................................................... 46, 48

*Playboy Enters v. Chuckleberry Pub., Inc.*,
  511 F. Supp. 486 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 563 (2d Cir. 1982)....... 43, 50

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995) .......................................................................................4

*Reebok Int'l, Ltd. v. Marnatech Enters, Inc.*,
  970 F.2d 552 (9th Cir. 1992)..........................................................................48

*Rhino Membranes & Coatings, Inc. v. Rhino Seamless Membrane Sys., Inc.*,
  2006 U.S. Dist. LEXIS 47957 (S.D. TX 2006) .................................................48

*Scanvec Amiable Ltd. v. Chang*,
  80 Fed. App'x 171 (3d Cir. 2003)............................................................. 46, 47

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
  668 F.3d 677 (9th Cir. 2012)..........................................................................12

*Software AG, Inc. v. Consist Software Solutions, Inc.*,
  2008 U.S. Dist. LEXIS 19347 (S.D.N.Y. 2008)................................................48

*Steele v. Bulova Watch Co., Inc.*,
  344 U.S. 280 (1952) ......................................................................................49

*Sterling Drug, Inc. v. Bayer AG*,
   14 F.3d 733 (2d Cir. 1994)............................................................ 48, 49

*Tdata Inc. v. Aircraft Technical Publishers*,
   411 F.Supp.2d 901 (S.D. Ohio 2001) ...............................................24

*The Antioch Co. v. Western Trimming Corp.*,
   347 F.3d 150 (6th Cir. 2003)...................................... 3, 4, 8, 12, 15, 16

*Traffix Devices, Inc. v. Mktg. Displays, Inc.*,
   532 U.S. 23 (2001) ....................................................... *passim*

*U.S. v. $5,730.00 in U.S. Currency*,
   109 Fed. Appx. 712 (6th Cir. 2004)..................................................13

*Vanity Fair Mills, Inc. v. The T. Eaton Co.*,
   234 F. 2d 633 (2d Cir. 1956)..................................................... 44, 49

*Versa Prods. Co. v Bifold Co.*,
   50 F.3d 189 (3d Cir. 1995)............................................. 14, 16, 17, 24

*Worthington Foods, Inc. v. Kellogg Co.*,
   732 F.Supp. 1417 (S.D. Ohio 1990) ..................................................38

*Wynn Oil Co. v. American Way Serv. Corp.*,
   943 F.2d 595 (6th Cir. 1991)............................................................36

## Statutes

15 U.S.C. § 1117(a) ........................................................... 29, 30

15 U.S.C. § 1125(a) ...................................................... 29, 30, 38

O.R.C. Section 4165.02 ................................................. 37, 38, 40

## Rules

Fed. R. Civ. P. 50 ..............................................................28

Fed. R. Civ. P. 51 ..............................................................28

## I.    INTRODUCTION

Like its other claims, Groeneveld's Lanham Act trade dress claim never should have made it to the jury, but, having made it to the jury, the verdict is against the greater weight of the evidence.  Aware of the infirmities in its case, Groeneveld spends the majority of its Brief making bald pronouncements not supported by the testimony it cites and arguing from law that does not apply here. This is a product configuration trade dress case where Groeneveld is trying to protect the configuration of a grease pump that it admits is made up of nothing but functional components.  The bottom line is that Groeneveld made no effort whatsoever to confront the real issues presented in this type of trade dress case as drawn by the Supreme Court, this Court, and other United States Courts of Appeals.  Mostly, it ignores this law altogether.

Whether in an attempt to buffalo this Court or because it just does not know any better, Groeneveld often misstates the applicable law.  On page 19 of its Brief, for example, Groeneveld recites four "admissions" from Lubecore's president, Jan Eisses: (1) he is able to recognize the Groeneveld pump by its shape and appearance; (2) he knows of Groeneveld's good reputation; (3) he does not mind that the pump looks like Groeneveld's because it is a good pump, meaning it functions well as a pump; and (4) Lubecore's pump could look differently and still function the way it does.   These "admissions," Groeneveld concludes, "in and of

themselves, sustain the Jury verdicts and the District Court's denial of Lubecore's post-verdict motions." (Brief at 19.)

How exactly these "admissions" do that does not seem to concern Groeneveld. Of course Mr. Eisses is able to recognize the Groeneveld pump by its shape and appearance. He worked with the pump for years when he was a Groeneveld distributor. It is irrelevant that Mr. Eisses simply knows of Groeneveld's good reputation. The relevant evidence in this case is that Lubecore, in attempting to establish its own brand, does everything it can to distance itself from Groeneveld as opposed to trying to take advantage of Groeneveld's reputation. It is irrelevant that Mr. Eisses is not concerned that Lubecore's pump looks like Groeneveld's because it is a "good pump." Groeneveld does not have a patent in the design of its pump, and in the United States competitors are free to copy and improve upon good products manufactured by others. Finally, in the law of functionality, it is irrelevant that Lubecore's pump could have looked different and still function the same way. The question is whether the configuration of Groeneveld's pump is non-functional, which it is not.

Like this one, as set forth below, Groeneveld's arguments throughout its Brief consist largely of setting up and ferociously knocking down straw men. This approach leaves Lubecore's arguments on appeal intact and unscathed.

2

## II.    REPLY ARGUMENT IN SUPPORT OF APPEAL

### A.    There Was Insufficient Evidence To Submit The Issue Of Functionality To The Jury.  Alternatively, The Finding That The Appearance Of The Groeneveld Pump Is Non-functional Is Against The Greater Weight Of The Evidence.

Groeneveld's argument that the configuration of the functional components that make up its grease pump is non-functional is that its pump could have been made to look differently than it does, that the designer of the pump wanted to make something that looked nice, and that Groeneveld's "commercial" people had a say in what the pump looked like.  These efforts fall far short of satisfying the test for the non-functionality of a product configuration established by the Supreme Court in *Traffix*, that there must be something "**arbitrary** about the components of [the] device or the way they are assembled." *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001) (emphasis added).  Groeneveld needed to demonstrate how the components of its pump are combined in a nonarbitrary manner, because, as stated by this Court when applying *Traffix*, "where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional."  *The Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003).  Groeneveld did not even try to do so, because it cannot.  As Lubecore has already demonstrated, there is nothing nonarbitrary about the

functional configuration of the base and reservoir of its pump, and the configuration is generously influenced by engineering necessity. *Id.*

Groeneveld relies heavily on *General Motors Corp. v. Lanard Toys Ltd.*, 468 F.3d 405, 417 (6th Cir. 2006), for the proposition that non-functionality can be demonstrated by testimony that the appearance of the product is not essential to its use or purpose. This, however, is not the test for non-functionality.[1] *General Motors* obviously followed both *Traffix* and *Antioch*. And it is hornbook law that this Court is bound by Supreme Court, and its own, precedent. *See, e.g. Carroll v. Renico,* 475 F.3d 708 (6th Cir. 2007) (explaining this Court is bound by its previous interpretation of Supreme Court precedent); *Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan,* 449 F.3d 688 (6th Cir. 2006) (explaining this Court is bound by its own precedent). Accordingly, *General Motors* did not do away with the requirement that non-functionality requires that there be something arbitrary about the configuration of the functional components. That requirement must be presumed to have been taken into account by this Court in making the decision that the elements which comprise the Humvee's trade dress "are inherently nonfunctional." *General Motors*, 468 F.3d at 417.

---

[1]    Groeneveld, in fact, seems intent on arguing from everything but the proper test. It opens its argument by reciting the *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995), test for the functionality of a *product feature*, but this is not a product feature case. (Brief at 20.) It is a product configuration case.

4

The majority of Groeneveld's opposition is devoted to an explanation of how its pump was designed back in the mid-1980s. This seems of marginal relevance at best. The point is not how the pump was designed twenty five years ago. The point is how it looks now, whether there is anything arbitrary or fanciful about the configuration of its functional components, and whether engineering necessity influences that configuration. One look at the Groeneveld pump in comparison with other ALS pumps currently on the market—including other Groeneveld pumps—demonstrates that there is nothing arbitrary or fanciful about the configuration of the functional components of Groeneveld's EP0 single line pump and that it is influenced by engineering necessity:












(PX 15-5, 44, 46, 47-1, 83-1, 84; DX CC.)

Put another way, it is not by coincidence that all of these pumps have a base that houses the pump components and a clear reservoir on top that holds the grease. If the exterior shape and appearance of the Groeneveld pump is arbitrary, fanciful, distinctive, and not influenced by engineering necessity, then so is the configuration of each and every other pump. That cannot possibly be the intended outcome of the product configuration non-functionality tests set forth in *Traffix* and

*Antioch.*   Rather, the configuration of the Groeneveld EP0 pump (top row, far right) is functional as a matter of law.

To the extent that it is relevant to the functionality analysis, the testimony regarding the genesis of the EP0 pump falls far short of demonstrating that Groeneveld intended that the configuration of the functional parts of its pump would be arbitrary and, as previously argued by Lubecore, it in fact demonstrates that the configuration was influenced by engineering necessity.

Groeneveld's oft-cited testimony of the involvement of the "commercial" people in the design of the pump undercuts its non-functionality argument.   On page twenty two of its Brief, Groeneveld quotes *some* of two exchanges with Mr. Van der Hulst regarding how the pump was designed and the involvement of the "commercial" people, but it cut the testimony short in both cases.   Here is the complete testimony for the two cites which Groeneveld claims demonstrate that the "commercial" people—whoever they are—"dictated" the pump's external appearance.

> Q.   And what about having a product that from, you know, the first drawing is ready to go into production within four months from – is that realistic possibility?

> A.   When you have nothing, you have only parameters.  You have no idea what you want to make.  So let's say you – you know that you want to make lubrication system but you have – because you cannot decide everything by yourself, as a

team, you decide how to have the pump to look like because commercial people have a finger in the pot, what is it, also their needs, yeah. In the interest of combination of a group of people who want to create something. You cannot do it alone. And this all – this information together takes a very long time but one wants, one wants horizontal, another one – there's a lot of information coming. And so four months is impossible. It's impossible.

*****

Q.     A little bit earlier, you mentioned something about the commercial people, that there are commercial issues that become involved in the creation of a product, such as the EP-0 pump, can you explain for us a little what kind of involvement such people have?

A.     Normally in Groeneveld, there's commercial people who decide what we are going to make. So they have the most power in the group. We have – we have monthly development meetings with commercial people inside, and they – **they give us information of what the market wants**. **So they listen to the clients, and then they learn, they read, they know what the competition is doing, and they tell we need this, we need that, and then it comes to me.**

(Transcript, RE 320, Page ID # 7918-20, emphasis added.) There is absolutely nothing in these passages about the external appearance having been dictated by the commercial people. To the extent that these passages do support that proposition, then the design of the pump was driven by what the market wanted and what the competition was doing. And there was no testimony whatsoever that

9

the consumers of automated lubrication systems demand grease pumps with something arbitrary or fanciful about them.

The remainder of the testimony about the design of the pump is equally ineffectual.  Groeneveld contends that the pump could look different than the way it does and still function the same way, but "[i]f trade dress is found to be functional, the mere fact that there are other non-infringing designs which would serve the same functional purpose is no defense to functionality."  *General Motors*, 468 F.3d at 418.  Groeneveld claims that it wanted its pump to look "nice" because its owner liked nice things, and to look "different" from the competitions' pumps. (Brief at 23-24.)

There is nothing in any of this testimony about including anything arbitrary or fanciful in the appearance of the pump that would distinguish it from all of the rest of the functional looking pumps.  There is nothing about putting anything ornamental on the pump that would not be dictated by engineering necessity.   In fact, as previously described by Lubecore, the appearance of Groeneveld's pump is dictated entirely by engineering necessity.  It works because it has a grease reservoir of a certain volume that holds a certain amount of grease. It works because it has an irregularly shaped base designed to accommodate a number of fittings that connect the pump to other external pieces.   The configuration of the base optimizes the amount of material needed for the base, and

10

the diameter of the top of the base dictates the diameter of the reservoir and, accordingly, its height.  There is nothing about the configuration of the pump that does not "work."

In *Mertik Maxitrol GMBH & Co. v. Honeywell Technologies Sarl*, No. 10-12257, 2012 WL 748304 (E.D. Mich. March 6, 2012), the plaintiff sought trade dress protection in a gas flow control unit.  Reasoning as follows, the court held that the allegations in the complaint did not support the claim that the appearance of the unit was nonfunctional:

> Each aspect of the design is stated exclusively in terms of its function.  The base is described by the components it contains and the functions of those components. The mounting holes allow "attachment to gas appliances," which is essential to the product's use because the product is built into appliances.  Plaintiffs describe knobs for adjusting the temperature and turning the device on and off, as well as the operation of those knobs.  Such controls are plainly essential to the product's use. The metal slab is also described purely in terms of its use in fastening the top cover onto the product.  The proposed trade dress includes nothing that could be considered ornamental, incidental, or arbitrary.  Plaintiffs only support for their claim that this dress is non-functional is the conclusory assertion that "Plaintiffs' protected trade dress is non-functional."  The specific facts pleaded by Plaintiffs indicate otherwise, and the Court concludes that the proposed trade dress is functional, and thus not protected under the Lanham Act.  "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."

*Id.* at *6 (*citing Traffix Devices,* 532 U.S. at 34, 121 S.Ct. at 1262).

11

The same analysis applies here, and the configuration of Groeneveld's pump is no more non-functional than were the configurations of the dual-spring stand in *Traffix*, the scrapbook album in *Antioch*, the tool in *Leatherman*, and the hoist in *Secalt*.

**B.  There Was Insufficient Evidence To Submit The Issue Of Likelihood Of Confusion To The Jury Or, Alternatively And Jointly, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence.**

**1.  Groeneveld Failed to Request a Jury Instruction Regarding The Presumption of Confusing Similarity That Can Arise from Evidence of Intentional Copying.**

Acutely aware that it presented no evidence whatsoever that anyone has ever been confused by the stark red labeling of the Lubecore pump, Groeneveld turns instead to a lengthy discussion of the presumption of confusing similarity that can arise from evidence of intentional copying of another's trade dress.  (Brief at 33-37.)  This entire argument is moot, however, because Groeneveld failed to request a jury instruction regarding this presumption.  While the jury was charged with respect to the presumption of secondary meaning that can arise from evidence of intentional copying, it was not charged with respect to the presumption of confusing similarity that can arise from evidence of intentional copying.  (Transcript, RE 325, Page ID # 8788-8791.)  As a matter of law, Groeneveld cannot argue from a presumption that the jury was never made aware of, one that is not in the record as having been given to the jury to consider.  *See,*

12

*e.g., Joe v. United* States, 510 F.2d 1038, 1040 (10th Cir. 1975) (because jury instruction on Aider and Abettor Statute was not given or requested, the government was precluded from relying on that statute on appeal); *U.S. v. $5,730.00 in U.S. Currency,* 109 Fed. Appx. 712 (6th Cir. 2004) (refusing to consider arguments based on document that was not in the record explaining "[w]e cannot consider evidence not in the record."); *City of Sterling Heights, Mich. v. United Nat. Ins. Co.,* 319 Fed. Appx. 357 (6th Cir. 2009) (explaining that in resolving an appeal, the court must disregard any facts not in the record).

Moreover, once again Groeneveld sidesteps the fact that this is a specific type of trade dress case, a product configuration trade dress case. Essentially, Groeneveld is trying to protect the unpatented design of its pump through trade dress law. It is worth repeating that competition fostered by copying another's product is valued in our economy:

> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. . . . Allowing competitors to copy will have salutary effects in many instances. Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.

*Traffix Devices,* 532 U.S. at 29 (internal quotations and citation omitted). "After all, copying preserves competition, which keeps downward pressure on prices and encourages innovation." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 640 (6th Cir. 2002).

In other words, it is fair to compete by trading off of the good will of another's unpatented product. Accordingly, intentional copying in a product configuration case has significance with respect to the likelihood of confusion "only where the product's labeling and marketing are also affirmatively misleading." *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 700, 715 (N.D. Ohio 1999) (*quoting Versa*, 50 F.3d at 208). Here, as Lubecore previously demonstrated, Lubecore's labeling and marketing clearly and distinctly identify the source of its products as Lubecore.

> **2.    The Strong Visual Impression of Dissimilarity between the Two Pumps Itself Should Be Dispositive of This Case.**

The bottom line in this case is that the behemoth Groeneveld cannot abide by the competition of the upstart Lubecore. Hence, it accuses Lubecore of making a grease pump that looks just like its pump, even though Lubecore, through its red labeling and logo, has taken more than reasonable steps to distinguish itself from Groeneveld.[2]

---

[2]    Groeneveld accuses Lubecore of having relied on pictures of the Groeneveld and Lubecore pumps in its Brief that are not in the record. (Brief at 38, n. 2.) This

Apart from the clear labeling that shouts out the dissimilarities between the pumps, the pumps look very similar. Lubecore has not denied that. These dissimilarities—the appearance of Lubecore's trademark, the Lubecore red label, the Lubecore red follower plate, for example—are sufficient to ward off any possible point-of-sale confusion between the pumps.

Groeneveld accuses Lubecore of "tellingly" having ignored this Court's holding in *Makers Mark Distillery, Inc. v. Diageo North Amer., Inc.*, 679 F.3d 410, 422 (6th Cir. 2012), that labeling in and of itself is not dispositive. (Brief at 39.) Lubecore, however, did not argue that labeling in and of itself is dispositive. Lubecore argued that, as stated by this Court, "[a] strong visual impression of dissimilarity ordinarily 'receives great weight in determining the likelihood of confusion.'" *Abercrombie*, 280 F.3d at 648 (citations omitted).

This Court's decisions in *Abercrombie*, *Antioch*, and *Frisch's Restaurant* dictate the "great weight" this Court places on "a strong visual impression of dissimilarity," including labeling, in the analysis of the likelihood of confusion. The "ubiquitousness of the producers' respective trademarks constantly indicating—on practically every page—the catalog's origin" was sufficient in *Abercrombie*, 280 F.3d at 648, to ward off any likelihood of confusion between the

---

accusation is false. The picture of the Groeneveld pump can be found at PX 3-1 and 4-1. The picture of the Lubecore pump can be found at PX 59-7 and 66-1.

catalogs at issue.  In *Antioch*, 347 F.3d at 160, the distinctive logos and face sheets provided "sufficient signals to scrapbook buyers that [Westrim's] albums are not made by Antioch."  And in *Frisch's Restaurant v. Shoney's, Inc.*, 759 F.2d 1261, 1265 (6th Cir. 1985), this Court held that "[b]y emphasizing '*Shoney's* Big Boy Restaurants', as it did in its advertising, Shoney's has identified *itself* as the source of the services."  Groeneveld ignores these decisions from this Court.  That is what is "telling."

Groeneveld also ignores that this is a specific type of trade dress case, one where Groeneveld is attempting to protect the overall configuration of its pump.  This case is exactly like *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996), where the plaintiff was trying to protect the "look" of its starch washer. The upstart competitor's starch washer was practically identical to Dorr-Oliver's, except that the competitor's name was on the nameplate and the housing. That, the Seventh Circuit held, was sufficient as a matter of law to eliminate any potential confusion in how the starch washers looked.  *Dorr-Oliver*, 94 F.3d at 383. The same was true in *Versa Prods. Co. v Bifold Co.*, 50 F.3d 189 (3d Cir. 1995), where the Third Circuit held that the labeling on the competitor's nearly identical valve was sufficient "to dispel any confusion about the valve's source that the configuration of the Domino Junior valve might otherwise engender in purchasers

who exercise ordinary care." *Versa*, 50 F.3d at 213.  Groeneveld did not even attempt address *Dorr-Oliver* or *Versa*.  That is telling.

And, indeed, Groeneveld produced no evidence that any consumer of automated lubrication systems was confused by the Lubecore red label and logo at the point of sale.[3]  While Groeneveld is fond of citing to testimony that the Lubecore pump looks like a Groeneveld pump with a Lubecore label, this testimony actually buttresses Lubecore's position that there was no evidence of actual confusion.  The Fluid-Quip starch washer in *Dorr-Oliver* looked like the Dorr-Oliver starch washer with the Fluid-Quip name on it.  The Bifold valve in *Versa* looked like the Versa valve with the Bifold name on it.  In those cases, the Seventh and Third Circuits held that the manufacturer-identifying labeling was sufficient to dispel any potential confusion.  The same is true here.  There was no testimony that the Lubecore pump looks like the Groeneveld pump *with a Groeneveld label*.  There is simply no mistaking the Lubecore red logo and labeling with Groeneveld's green label.

---

[3]    Lubecore invites the Court to carefully scrutinize Groeneveld's transcript citations.  On page thirty seven of its Brief, Groeneveld cites to several passages for the proposition that there was testimony at trial by multiple witnesses that they were "shocked" and "stunned" by the similarities between the pumps.  In fact only one of the citations contains the word "shocked," and none of them contain the word "stunned."

Groeneveld cites to only three passages for the proposition that "[w]itnesses testified that they were shocked and confused when they saw Lubecore's pump because it looks exactly like Groeneveld's." (Brief at 42.) The first is from Dean Osborn. (RE 173, Osborn Trial Dep., Page ID # 4393-95.) Mr. Osborn did not express any confusion as to the source of the Lubecore pump. His testimony was that he did not care about the source of the pump as long as it worked to pump grease:

> Q.    Does anything about the, say, Lubecore label on the product and that red band on the follower plate tell you that its inner-mechanics are different than the inner-mechanics of the Groeneveld?
>
> A.    No. It would -- to me what I would think is if you just, if you took off the top half of the thing and you took all the labels off of these things, take the red thing off and the black one and you take the label off here and you put that base with this off and that off and you look at the bases, to me I would not tell the difference. And to me that means I'm comfortable with the product. **If it be whose product it is, I don't care**. I have a good experience with it. So I'm very comfortable with it. **Whatever labels you put on it or sticker, you know, I mean it doesn't matter. I'm looking at the mechanism that functions the grease to go to the spots where the greasing, that's all I'm – that's all I care about**.

(RE 173, Osborn Trial Dep., Page ID # 4394-95, emphasis added.) And Groeneveld conveniently failed to cite to Mr. Osborn's testimony that, in

18

purchasing Lubecore pumps, he was not confused in any way as to the origin of the pump:

> Q. **All right.  Thank you.  When you bought the four Lubecore systems, it was clear to you that you were buying Lubecore systems, not Groeneveld systems, correct?**
>
> A. **Correct**.
>
> Q. Garvin has told you as much himself?
>
> A. Um-hum, yes.
>
> Q. And the product has got Lubecore's label on it more than one place, right?
>
> A. Yes.
>
> Q. And you said you were given some Lubecore marketing materials?
>
> A. Yes.
>
> Q. **So there was no confusion on your part about whose product you were buying?**
>
> MS. MICHELSON:  Objection.
>
> THE WITNESS:  **Correct.**

(RE 173, Osborn Trial Dep., Page ID # 4399-4400, emphasis added.)  Mr. Osborn was the only purchaser of a Lubecore pump who testified at trial, and he was not at all confused as to the origin of the pump.

Next Groeneveld cites to the testimony of Groeneveld distributor Mike DeCleene.  (Transcript, RE 321, Page ID # 8129-30.)  This is not evidence of any confusion as to the source of a Lubecore pump.  The first time Mr. DeCleene

saw a Lubecore pump he thought it was a Groeneveld pump with a Lubecore label, and he called his Groeneveld contact to ask him about Lubecore.  He was neither shocked nor confused.  Groeneveld's third and last citation to "actual confusion" is to the testimony of Orville White.  (Transcript, RE 321, Page ID # 8203.)  All Mr. White testified to is that the Lubecore pump looked to him like a Groeneveld pump with a Lubecore label, and he was able to correctly identify the Lubecore and Groeneveld pumps before him:  "I see two pumps sitting there, and one of them has Lubecore on it and the other has Groeneveld.  And I'm assuming the one Lubecore pump label is a Lubecore."  Hardly any confusion there.

Groeneveld claims that its National Fleet Account Manager Kees Wapenaar "had to run serial numbers to determine whether pumps he saw with Lubecore labels were in fact manufactured by Groeneveld."  (Brief at 43.)  The cited testimony, however, is as follows:

> Q.    Okay.  Let me show you a different one.  Well, wait.  I'm going to ask you a question about it, PX-55.  Looking at this picture, how are you able to tell, you, able to tell that this is not a Groeneveld pump with a Lubecore sticker?
>
> A.    The only identification you have on this particular picture is that ID plate that sits up front of the pump.  I can't see anything else.

(Transcript, RE 321, Page ID # 8079.)  There is nothing whatsoever in this testimony about "running down serial numbers."

20

Groeneveld claims that Mr. Van der Hulst, the designer of the Groeneveld pump, "only realized that the Lubecore was not made from Groeneveld tooling when he had the pump in his hands and could make an expert assessment." (Brief at 43.) Mr. Van der Hulst testified, however, that he knew the Lubecore pump had not been made with Groeneveld tooling because Groeneveld was not missing any tooling. (Transcript, RE 320, Page ID # 7956.) He was also able to assess the differences in the bases of the two pumps by looking at photographs of the Lubecore pump. (*Id*., Page ID # 7957-59.) He did not need to have the Lubecore pump in his hands or to make an "expert assessment."

Even considered most-charitably, the best that Groeneveld has done is to have established some minor, legally irrelevant, initial-interest confusion. "Initial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP,* 423 F.3d 539, 549 (6th Cir. 2005). This Court, however, has refused to apply this concept to product-shape trademarks because "[m]any, if not most, consumer products will tend to appear like their competitors at a sufficient distance." *Id.* at 552. That being the case, the doctrine of initial-interest confusion does not extend to something like the external shape and appearance of Groeneveld's grease pump.

21

Aware that it failed to produce even a single instance of actual point-of-sale confusion—Mr. Osborn was the only witness who had purchased a Lubecore pump and he testified unequivocally that he was NOT confused—Groeneveld throws post-sale confusion against the wall, hoping that it will stick. (Brief at 44-46.)  Its principal argument seems to be that there was evidence that the Lubecore pump is inferior to the Groeneveld pump because the Lubecore pump went through a recall (logic that says that Rolls Royce, for example, is inferior to Kia if it, but not Kia, has done a product recall) and because there have been dissatisfied Lubecore customers (logic that says that Rolls Royce is inferior to any brand that one of its customers would leave it for).

This misses the point entirely.  Groeneveld put forth zero evidence that any Lubecore customer who purchased a grease-leaking pump that was recalled somehow attributed its ill-will to Groeneveld because the customer was confused between the two pumps.  If anything, Groeneveld's evidence establishes only that Lubecore had to overcome some reputational problems of its own.  It does not in any way establish post-sale confusion.

In short, there was no evidence of actual point-of-sale confusion in this case.  And whatever Groeneveld wants to trump up about how about how labeling is somehow meaningless in the automated lubrication system industry, they are dispelled by two simple facts, the first being that Groeneveld labels its

pump.  Groeneveld would not bother labeling its pumps if labels do not mean anything in this industry (as opposed to all others).  Second, the red Lubecore logo label must be a stronger identifier than any other in the industry, because Groeneveld could not find a single purchaser of a Lubecore pump to testify about confusion over the origin of the pump.

### 3. Purchasers of Automated Lubrication Systems Are Sophisticated Consumers Who Take Great Care in Selecting which Product to Buy.

As previously argued by Lubecore, witnesses for both Groeneveld and Lubecore testified to the complex process of selling automated lubrication systems.  Rather than disavowing the testimony of it own witnesses, Groeneveld instead argues that this is one of the rare cases where "the likelihood of confusion actually increases when consumers are careful or sophisticated."  (Brief at 47.)  Groeneveld opines that "[w]hen, for instance, purchase prices are comparable . . . or the knock-offs look exactly the same . . . , consumers familiar with the product may presume (mistakenly) that the defendant's products are the same or related, or that the sellers are affiliated."  (*Id.*)

Groeneveld cobbles together this misleading statement from two cases.  The first is *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275 (6th Cir. 1997).  There the plaintiff and defendant both sold musical instruments, and the issue was that an extremely sophisticated purchaser of

an instrument—one that could be purchased from either store—might think that the *stores* were affiliated because of the similarity in their names:

> That is, confusingly similar marks might lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated or identical to the other party.

*Id*. at 286. That is not the situation here. And *Tdata Inc. v. Aircraft Technical Publishers*, 411 F.Supp.2d 901, 910 (S.D. Ohio 2001), only stands for the unremarkable proposition that sometimes even sophisticated consumers can get it wrong, that "even a sophisticated buyer knowledgeable about a product may nonetheless presume company affiliations where none exist."

The general rule remains, however, that "a plaintiff must show a likelihood that a consumer exercising ordinary care to discover the identity of the source would suffer confusion or be mistaken because of the appearance of the allegedly infringing product configuration." *Versa*, 50 F.3d at 205. The long and complex sales process and the clarity of labeling here preclude any such likelihood. If as a matter of law purchasers of starch washers exercising reasonable care could not be confused between the identical Dorr-Oliver and Fluid-Quip starch washers at issue in *Dorr-Oliver*, as a matter of law purchasers of grease pumps exercising reasonable care cannot be confused between the Groeneveld and Lubecore pumps at issue here. The same is true with respect to the valves at issue in *Versa*.

The testimony of how quickly Mr. Osborn purchased a Lubecore pump hurts, rather than helps, Groeneveld.  Mr. Osborn was not confused that he was purchasing a Lubecore pump rather than a Groeneveld pump, and he did not purchase the Lubecore pump because of Groeneveld's reputation.  He purchased it, not caring who made it, because it looked like a good, functioning pump:

> Q.    Does anything about the, say, Lubecore label on the product and that red band on the follower plate tell you that its inner-mechanics are different than the inner-mechanics of the Groeneveld?
>
> A.    No.  It would -- to me what I would think is if you just, if you took off the top half of the thing and you took all the labels off of these things, take the red thing off and the black one and you take the label off here and you put that base with this off and that off and you look at the bases, to me I would not tell the difference.  **And to me that means I'm comfortable with the product**.
>
> **If it be whose product it is, I don't care**.  I have a good experience with it.  So I'm very comfortable with it.  Whatever labels you put on it or sticker, you know, I mean it doesn't matter.  **I'm looking at the mechanism that functions the grease to go to the spots where the greasing, that's all I'm --that's all I care about**.

(RE 173, Osborn Trial Dep., Page ID # 4394-95, emphasis added.)

> Q.    Sir, would you have considered or bought the Lubecores if the pump didn't look so much like the Groeneveld pump?
>
> A.    It made me very comfortable when it -- when that looks like a Groeneveld and -- the big thing is is the uncertainty of what kind of greaser I could have got, all right.  So

you take this greaser to where it might be coming off the market in this area, and this one comes up.

Q.    Meaning the Lubecore?

A.    The Lubecore, **the comfort zone of knowing that it looks identical to it and it probably operates the same thing,** they, you know, in the literature they have the blocks of where the main grease goes to the different blocks and then it goes out. Everything to me resembles the same, you know what I mean. The Lubecore and Groeneveld, they look like sister machines, okay. They look like twins. And for me making my decision on buying a greaser, that's easy. I like these two systems. **Who owns it doesn't matter to me. I just want the grease to go to the places to where** -- and I want a place here to service it.

If I have an issue, I need it serviced. And that's where, you know, it all came to play. That's how I made my decision.

(*Id*., Page ID # 4397-98, emphasis added.)

Groeneveld does not have a patent in the design of its pump, which is effectively what it is trying to get here. The design of this pump works well, according to Mr. Osborn, and he was pleased to be able to purchase a pump *of this design* from Lubecore when Groeneveld stopped selling pumps in his area.

Lubecore stands by its analysis of the remaining *Frisch* factors. There was no evidence in this case that even a single purchaser of a Lubecore pump was confused, at the point of sale, as to the source of the pump. Nor could there be,

26

given the clear labeling on the Lubecore pump and a sales process where Lubecore goes out of its way to distinguish itself from Groeneveld.

**C.    There Was Insufficient Evidence To Submit The Issue Of Secondary Meaning To The Jury Or, Alternatively, Lubecore Is Entitled To A New Trial Because The Verdict Is Against The Weight Of The Evidence.**

As previously argued by Lubecore, the seven factors according to which secondary meaning is assessed tilt in favor of Lubecore. Again, the biggest question is why, if the configuration of the Groeneveld pump alone identifies it as a Groeneveld, there is a need for Groeneveld to label it with a huge green label in all of its brochures and advertising. If the configuration of the EP0 pump alone says "Groeneveld," all of the labeling is a superfluous waste of money.

**D.    Lubecore Is Entitled To Judgment As A Matter Of Law, Or Alternatively, A New Trial Regarding Groeneveld's Damages For Lack Of Any Evidence Of A Causal Link To Lubecore's Alleged Infringement And Because Groeneveld's Damages Theory Was Speculative.**

**1.    Lubecore Preserved Its Damages Argument for Appeal.**

Groeneveld's contention that Lubecore waived its damages argument is borderline absurd. Without citing any law, Groeneveld asserts first that because Lubecore did not object to the jury instructions regarding Groeneveld's actual damages and Lubecore's profits, Lubecore is now somehow precluded from arguing that the record in this case demonstrates conclusively that the jury in fact awarded Groeneveld only its actual lost profit damages. (Brief at 55.) This makes

27

no sense.  The jury, for example, was instructed to consider all of the *Frisch* factors in its analysis of likelihood of confusion.  Nonetheless, Lubecore is not precluded from arguing that there was no evidence of actual confusion even though it did not object to that instruction.

It is also a mystery how Groeneveld can possibly claim that Lubecore waived its argument that Groeneveld's damages are too speculative as a matter of law.  Lubecore advanced (and thus, preserved) this argument during the oral argument on Lubecore's pre-verdict Rule 50 Motion:

> [E]ven if by some chance any of these claims go to the jury on damages, there's not a scintilla of evidence in the record to support that any purchaser of a good from Lubecore has done so as a result of any of the alleged conduct in violation of the Lanham Act or the Ohio Deceptive Trade Act, or unfair competition under common law, whatever they have.
>
> All they have is Lubecore made some sales, and they want to say that all of those sales should be attributed to Groeneveld as Dr. Burke testified, absent any proof that any of those sales were made as a result of the infringing activity.  Their damages are zero.  And I submit that there has been zero evidence that any sale has been made by Lubecore as a result of anything that could be described as infringing activity.

(Transcript, RE 325, Page ID # 8745.)

The cases Groeneveld cites in its waiver argument are curious and inapposite.  *Hartford Fin. Servs. Group., Inc.*, 168 Fed. Appx. 26, 32 (6th Cir. 2006), stands for the proposition that Fed. R. Civ. P. 51 requires a party to object to

28

a jury instruction to preserve the party's right to appeal the particular jury instruction.  Here, Lubecore is not trying to appeal any jury instruction.  *Benaugh v. Ohio Civil Rights Comm'n*, 278 Fed. Appx. 501, 507, n.1 (6th Cir. 2008), discusses the December 1, 2006 amendment to Rule 50(b) deleting the requirement that a Rule 50(a) motion must be made at the close of all of the evidence.  And *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665 (E.D. Mich. 2002), is a decision on cross-motions for summary judgment that does not address any waiver issues whatsoever.

### 2.    Groeneveld Was Awarded Actual Lost Profits, Not Disgorgement of Lubecore's Profits.

Groeneveld should not be permitted to play fast and loose with the record in this case, which demonstrates conclusively that it was awarded its actual lost profit damages (albeit with no proof of causation), and not Lubecore's profits. The difference between "profits" and "damages" under the Lanham Act is not just a matter of semantics.  Instead, 15 U.S.C. § 1117(a) clearly distinguishes between the two:

### (a)    Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the

provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover

**(1)**    defendant's profits,

**(2)**    any damages sustained by the plaintiff, and

**(3)**    the costs of the action.

The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

As a matter of law, there are two types of recovery under this section, the defendant's profits and the plaintiff's actual damages.  There are not two types of "damages."  Damages can be enhanced by the court, by a sum up to three times the actual damages.  An award of profits can be adjusted up or down, "as the court shall find just."

Here, the jury awarded Groeneveld damages, not profits:

We the jury, being duly impaneled and sworn in, find by a preponderance of the evidence in favor of the Plaintiff

30

> Groeneveld on Plaintiff's claim of Trade Dress Infringement under the Lanham Act, 15 U.S.C. § 1125(a) and against Defendant Lubecore and award **damages**, if any, in the amount of $1,225,000.00

(Verdict, RE 224, Page ID # 5627; Judgment, RE 229, Page ID # 5639-40, emphasis added.)

Groeneveld did not object to the verdict form. The record in this case is indisputable on this point. The jury did not award Groeneveld Lubecore's profits. It awarded actual damages, and only actual damages.

That only actual damages were awarded is also clear from the fact that in its Judgment, the trial court set a due-date only for Groeneveld to file a motion for treble damages. (Judgment, RE 229, Page ID # 5641.) The trial court did not set a due-date for Groeneveld to file a motion that an award of profits was inadequate, or for Lubecore to file a motion that an award of profits was excessive.

That only actual damages were awarded is also clear from Groeneveld's Motion for Enhanced Damages, where Groeneveld sought treble damages of $4.9 million, or four times the damages award of $1,225,000. (Mot. for Enhanced Damages, RE 237, Page ID # 5991.) It is disingenuous of Groeneveld, to say the least, to claim that any or all of the jury award was for profits, when it moved to have the entire award trebled as damages.

### 3. There is No Causal Link between Groeneveld's Claimed Lost Profits Damages And Lubecore's Alleged Trade Dress Infringement.

Groeneveld's opposition on the causation issue does nothing to dispel the fact that there is zero evidence in the record in this case of a causal link between Groeneveld's claimed lost profit damages and Lubecore's trade dress infringement. And, again, Groeneveld betrays that it fundamentally does not understand the difference between "profits" and "damages" under the Lanham Act.

Lubecore concedes that it overstated Groeneveld's damages model by describing it as assuming that *every* sale made by Lubecore would have been made by Groeneveld. In fact, Groeneveld excluded from its damages calculation revenue Lubecore earned on sales made in two or three parts of the country not covered by Groeneveld. (Transcript, RE 323, Page ID # 8369.) Other than that, however, Groeneveld's damages model assumes that for every area in which the two compete, *every* sale made by Lubecore would have been made by Groeneveld.

There is, however, not a scintilla of evidence in the record in this case to buttress the assumption that, but for the infringement, Groeneveld would have made all of these sales. There was no evidence of even a single sale that Groeneveld lost because a confused customer bought a Lubecore pump and was in any way confused about the source of that pump. To the contrary, Dean Osborn— the only witness who purchased a Lubecore pump—testified unequivocally that he

knew in advance of his purchase that he was getting a Lubecore, that Lubecore was not related to Groeneveld, and that he was not confused.  (RE 173, Osborn Trial Dep., Page ID # 4399-402.)

Groeneveld's discussion of *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F. 2d 1232, 1235 (6th Cir. 1991), while accurate, adds nothing to its opposition because it does not change the fact that while in *Broan* there was sufficient evidence of causation to send the issue of damages to the jury, there was no such evidence here.  Groeneveld simply did not prove that "some damages were the certain result of the wrong." *Id.*  Instead, Groeneveld again stretches the record in this case beyond its breaking point.  Groeneveld states that "[w]itnesses testified about diverted sales and customers who bought Lubecore's ALSs because its pump looks exactly like Groeneveld; and Lubecore's whole business strategy was to sell to Groeneveld customers ALS products that look exactly like Groeneveld's, using known Groeneveld distributors, and marketing its products as compatible and interchangeable with Groeneveld's."  (Brief at 65-66.)

As has been the case throughout Groeneveld's Brief, however, the record citations do not come close to supporting this statement.  As demonstrated above, Dean Osborn was not confused as to the source of the pump he purchased from Lubecore—he just wanted a good pump that could be serviced by a local distributor, and Groeneveld no longer had a local distributor.  (RE 173, Osborn

Trial Dep., Page ID # 4378-79, 4397-98.)   The cited testimony from Mike DeCleene is about other Groeneveld customers who have purchased one or more Lubecore systems.   (Transcript, RE 321, Page ID # 8130, 8133-35.)   The cited testimony from Gail Wilson is about Groeneveld employees and distributors who were terminated by Groeneveld and who have since chosen to work for and with Lubecore.   (Transcript, RE 323, Page ID # 8344-45, 8404-06.)   Plaintiff's Exhibit 66 is a Lubecore brochure, trimmed in Lubecore red, with the red Lubecore logo displayed at least four times on it, and Plaintiff's Exhibits 85 and 86 are Lubecore grease warranties.

There is nothing in these citations about witnesses testifying about diverted sales, or about customers who bought Lubecore's ALSs because its pump looks exactly like Groeneveld's, other than in the innocuous sense that if one product looks like another well-functioning product, it might be good, too.   There was nothing about Lubecore's whole business strategy being to sell to Groeneveld customers, using known Groeneveld distributors, and nothing about Lubecore marketing its products as compatible and interchangeable with Groeneveld's.

On the other hand, Groeneveld chose to not even address this Court's decision in *Jeffrey Chain, L.P., v. Tropodyne Corp.*, 238 F.3d 421 (6th Cir. 2000), which is on all fours with this case.   There, this Court reversed the district court's denial of a Rule 50 motion, concluding that the damages the plaintiff attributed to

the defendant were "purely speculative" because there was insufficient evidence of causation.  *Id.* at *19.  Just as in *Jeffrey Chain*, Groeneveld admits that the decline in its sales that it holds up as evidence of lost sales due to Lubecore's infringement can be explained by many factors, including the economy and the fact that it had lost one of its distributors:

> Q.   And there -- and looking in the USA column specifically, really across the board, there is a dip from '08 to 2009.  Do you see this here?
>
> A.   Yes.
>
> Q.   And what factors are those attributable to, that dip?  What is that attributable to?
>
> * * *
>
> THE WITNESS:  There are many influences that go into that dip.  For certain, for sure, part of it is just the drop in the marketplace with the hit of the lack of financing, and the tightness in the capital markets meant that some of our customers were unable to purchase systems or lack of confidence, you know, just the general economic downturn, and as well, missing a full quarter of the sales that would have otherwise gone through our distributor Fuel Systems and other customers that may have purchased competitive product.

(Transcript, RE 323, Page ID # 8341-42.)   Significantly, Groeneveld did not attribute **any** of the drop in its U.S. sales of EP0 pumps from 2008 to 2009 to Lubecore's infringing sales.

35

Next, Groeneveld cites to *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942), and *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595 (6th Cir. 1991), as support for the proposition that "[t]o withstand a causation challenge, proof is not required that, but for the infringement, each sale made by the defendant would have gone to the aggrieved plaintiff.  Rather, evidence that the plaintiff's anticipated sales declined is all that is legally required."  (Brief at 65.)

*Mishawaka* and *Wynn Oil*, however, are profits cases, not damages cases, and there is no issue of causation in profits cases, where the award is disgorgement of the infringer's profits rather than the actual damages to the plaintiff *caused* by the infringing conduct.  *Mishawaka* stands for the proposition that the burden is on the infringer to demonstrate what profits should not be disgorged because they were "demonstrably not attributable to the unlawful use of this mark."  316 U.S. at 206.  Similarly, *Wynn Oil* stands for the proposition that the infringer bears the burden of apportioning its profits between those earned through infringing conduct and those earned otherwise.  943 F.2d at 606.  Neither case supports in the least the proposition claimed by Groeneveld.

Finally, the corrective measures Groeneveld took in the wake of Lubecore's alleged infringement cost $18,000 – $20,000.  (Transcript, RE 322, Page ID # 8333-35.)   Given the complete lack of evidence that any of

36

Groeneveld's lost sales were caused by Lubecore's allegedly infringing conduct, that is the most the jury could have awarded Groeneveld as its actual damages.

## III.    ARGUMENT IN OPPOSITION TO GROENEVELD'S APPEAL

### A.    The District Court Properly Dismissed Groeneveld's Unfair Competition And Ohio Deceptive Trade Practices Act Claims.

Rather than revive Groeneveld's common law unfair competition and Ohio Deceptive Trade Practices Act, O.R.C. Section 4165.02, ("ODTPA") claims, a *de novo* review of the evidence before the district court on Lubecore's Fed. R. Civ. P. 50 motion mandates that <u>no</u> claim should have been sent to the jury.[4]  The district court properly dismissed Groeneveld's common law unfair competition and ODTPA claims (and other claims) and, as set forth above, should have dismissed Groeneveld's Lanham Act trade dress claim.

"Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another." *Water Management, Inc. v. Stayanchi,* 15 Ohio St.3d 83 (1984) (holding that "there were neither allegations nor findings at the trial level of any unfair competition . . . [and] any suggestion by the appellate court that appellants in the

---

[4]    Groeneveld repeatedly confuses the applicable analysis here.  Groeneveld acknowledges the *de novo* review standard, but then cites cases about deference to a jury's verdict.  If – as is the case here – a claim should never have been sent to the jury as a matter of law, no deference to the ultimate verdict is necessary or appropriate.

instant appeal have engaged in such conduct is unfounded since it is not demonstrated by the record.")

Generally, the ODTPA is a codification of the common law. *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1431 (S.D. Ohio 1990). The ODTPA provides in relevant part:

> A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person * * *
>
> * * *
>
>   (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
>   (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another[.]

Lubecore does not dispute that this statute is similar to Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a). Thus, claims for common law unfair competition and ODTPA are subject to similar standards as their federal counterparts under the Lanham Act. And "[w]here claims are made under the Ohio common law and the deceptive trade practices statutes, [Ohio] courts are to apply essentially the same analysis as that applied in assessing [the law of] unfair competition under the federal statutes." *Cesare v. Work,* 36 Ohio App. 3d 26 (Ohio App. 9th Dist.1987).

Thus, the issue is not whether there are overlapping elements of these claims and the trade dress infringement claim that went to the jury. The issue is that there was not sufficient evidence to send any claim to the jury. At trial – and as discussed at length above – there was no evidence of any confusion in the market, or the likelihood thereof. In a misleading way, Groeneveld repeatedly declares the contrary in its brief. For instance, on page sixty eight, Groeneveld says "people who saw Lubecore's pump thought it was a Groeneveld, or just as good." No witness ever said that, and Groeneveld's failure to ever really highlight the actual testimony behind its record cites is telling. In fact, the record cite Groeneveld repeatedly relies upon for the aforementioned and other similar demonstrably false characterizations of testimony throughout its brief is the testimony of Dean Osborn, a trucker who was the only witness who bought pumps from both Lubecore and Groeneveld. But, as has been discussed, Osborn knew exactly what he was purchasing at all times, and was not confused in any way as to the origin of any ALS pump. (RE 173, Osborn Trial Dep., Page ID # 4399-4400.)

Groeneveld also discusses Lubecore's founder's past affiliation with Groeneveld. This is not evidence of confusion either. There is nothing confusing about an individual highlighting his past job experience in a sales call. The record is clear that Mr. Eisses was not bound by any restrictive covenant, and Groeneveld does not even allege as much. The rule of law that Groeneveld seems to be asking

this Court to adopt would make it "unfair competition" for anyone to leave his job and subsequently tout or rely upon his prior experience in his future endeavors.

Groeneveld next alludes to Lubecore's so-called product quality issues, but it again distorts the record. While Lubecore did discuss a product recall at trial, the recall involved two minor issues involving the need to replace two small component parts in the pumps, an "O-ring" and a "soldier rod." (Transcript, RE 324, Page ID # 8564-69.) And, as Mr. Eisses testified, at this point, "all of the performance issues of the pump have been addressed. (*Id.*, Page ID # 8569.) In any case, the fact that a new product had minor performance issues upon market entry is not surprising and it does not constitute unfair competition or a deceptive trade act or practice. And, any quality issues with Lubecore's product would seem to help – not hinder – Groeneveld in the marketplace.

While Groeneveld's cross-appeal does not ask this Court to reverse the district court's dismissal of Groeneveld's false advertising claim, Groeneveld argues that there was evidence of false advertising by Lubecore that also supports a claim for unfair competition or violations of the ODTPA. Like most of Groeneveld's record citations, those listed in this paragraph on page sixty nine of Groeneveld's Brief support no such conclusion or amount to nothing. For instance, Groeneveld charges that "Lubecore's extended warranty program targets Groeneveld customers and products, offering to repair Groeneveld pumps and

replace them and their component parts with Lubecore pumps and parts. Factually, this statement is true. (Transcript, RE 325, Page ID # 8690.) However, there is nothing nefarious about this common business practice and it is not confusing. Groeneveld cites no authority that would even so much as suggest otherwise. Groeneveld's conclusory assertion that "this practice also contributed to a false impression of affiliation, connection, sponsorship and interchangeability" is not supported by record evidence and is not logical. In fact, Lubecore's warranty practice supports the exact opposite conclusion: it shows Lubecore's efforts to distinguish itself in the market as a separate, competing brand. This practice refutes any inference that Lubecore was trying to confuse customers about the source of its products.

Finally, there is no support for Groeneveld's request that this Court enter judgment on its punitive damages claim for twice the jury verdict. Even if this Court were to somehow re-instate these dismissed claims, there is no basis upon which to conclude that the jury would have found in favor of Groeneveld on them or that it would have awarded punitive damages, and Groeneveld cites no authority that would lead to that requested result.

**B.     The Permanent Injunction—If Allowed To Stand—Is Properly Limited To The United States.**

After trial, Groeneveld asked the district court to enjoin Lubecore from selling its EP0 single line grease pump in both the United States and Canada.

41

The district court rejected that request and properly limited the injunction to the United States.  The district court's order should be upheld.

Lubecore's sales activities in Canada were never an issue in this case.  In fact, Groeneveld went to great lengths to make that point when it opposed Lubecore's Motion to Stay this Action Pending the Outcome of Parallel Proceedings in Ontario, Canada.  (RE 24.)  And at no point during the three-day preliminary injunction hearing or seven-day trial did Groeneveld introduce a single piece of evidence or any testimony relating to Lubecore's conduct in Canada.  Lubecore had no notice of any claim against it relating to its conduct in Canada.  Enjoining Lubecore's conduct in Canada would be improper and unjust to Lubecore, and would reward Groeneveld for its sandbagging.

Groeneveld sites several cases supporting the proposition that in some limited circumstances a party may be entitled to extraterritorial relief under the Lanham Act.   Groeneveld's use of these cases is misleading.   When asked for extraterritorial relief under the Lanham Act, a court should consider (1) whether "the defendant's conduct has a substantial effect on commerce in the United States"; (2) whether "the defendant is a citizen of the United States"; and (3) whether a conflict exists between "the defendant's trademark rights under foreign law and the plaintiff's rights established under United States law."  *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 720, 722 (N.D. Ohio 1999).

With respect to the first factor, Groeneveld must show not only that the sum of Lubecore's post-injunction conduct in Canada could have a substantial effect on United States commerce, but that the breadth of the injunction it seeks is necessary to protect Groeneveld's interests in the United States. Here, that interest is in avoiding product confusion. *Playboy Enters v. Chuckleberry Pub., Inc.*, 511 F. Supp. 486, 495-6 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 563 (2d Cir. 1982) (declining to enjoin foreign use of infringing mark where "[p]laintiff ha[d] not submitted evidence to determine whether consumers in other nations would also be confused"). Enjoining Lubecore's sales activities in Canada is not necessary to protect Groeneveld's interests in the United States for several reasons. First, there was no evidence of any confusion in Canada or any other nation. Second, it is undisputed that Lubecore's product is manufactured in South Korea, not in the United States, and that Lubecore's sales in the United States go through distributors located in the United States, not in Canada. (Transcript, RE 324, Page ID #8552; 8583.) And third, although it is true that Lubecore has distributors in Canada, those distributors sell to Canadian customers, and there was no evidence related to Lubecore's Canadian distributors in this case. It is hardly necessary to protect Groeneveld's interests in the United States with an extraterritorial injunction to guard against the off chance that a Canadian truck or two with a Lubecore pump will cross the border.

Furthermore, none of the cases cited by Groeneveld support its claim that Lubecore's conduct in Canada has a substantial effect on commerce in the United States.

*Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 720 (N.D. Ohio 1999) (Carr. J.) involved a foreign defendant that had a United States corporation as a co-conspirator.  The two worked together to create the allegedly infringing products and sell them in the United States.  In denying the defendants' summary judgment motion, the court did not actually grant the extraterritorial relief sought by the plaintiff, but merely observed that because the foreign company "manufactured [the] glassware at issue" and because "the glassware at issue [was] sold in the United States," the plaintiff had "raised a question of material fact as to whether [the foreign company's] conduct substantially affected commerce in the United States." *Id.* at 724.  This does not in any way support the proposition that a United States court may enjoin a Canadian company from having a product made in South Korea and then selling it only in Canada. (Transcript, RE 325, Page ID # 8719-20.)

In *Vanity Fair Mills, Inc. v. The T. Eaton Co.*, 234 F. 2d 633 (2d Cir. 1956), a domestic company sought to apply the Lanham Act extraterritorially to a Canadian company with scant sales in the United States by enjoining it from using a mark that the domestic company argued was confusingly similar.  The court

rejected the plaintiff's effort and held that the only part of the three-part test met was that there was a substantial effect on United States commerce, which was not enough to justify an injunction.   In so doing, the court observed that "the rights and liabilities of United States citizens who compete with foreign nationals in their home countries **are ordinarily to be determined by the appropriate foreign law**." *Id.* at 639 (emphasis added).  Here, we are not even talking about the rights of a United States citizen, because the Groeneveld entity that competes with Lubecore in Canada is a Groeneveld distributor named, CPL Systems Canada, and not the plaintiff in this action.  In fact, there is absolutely no evidence in this case that Plaintiff Groeneveld Transport Efficiency, Inc. conducts any business whatsoever in Canada.  If there is a reason why Lubecore should be prohibited from selling its pump in Canada in competition with CPL Systems Canada, that reason should be determined by Canadian law.

In *A.V. by Versace, Inc. v. Gianni Versace, S.p.A*, 126 F. Supp. 2d 328 (S.D.N.Y. 2001), the defendant, though nominally a foreign entity, "conduct[ed] the vast majority of his foreign activities from his New York office and showroom . . . [and he did not] maintain any foreign offices."  *Id.* at 341.  By contrast, Lubecore's operations are organized in Canada, not the United States, and its outsourced manufacturing occurs in South Korea.

In *Scanvec Amiable Ltd. v. Chang*, 80 Fed. App'x 171, 181 (3d Cir. 2003), the court found that the plaintiffs had shown that there was a "commercial nexus" (i.e. substantial effect) in the United States because "the record indicate[d] that [the defendant] orchestrated its actions in China from the United States, using materials and customers developed in [the United States] to materially further the launch of a confusingly similar product overseas."  Again, in this case, there is no evidence that anything was "orchestrated" by Lubecore in the United States, where Lubecore does not even maintain an office.

The court in *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303 (5th Cir. 2003), did permit extraterritorial application of the Lanham Act, but did so noting that "essential steps in the course of business consummated abroad" were taken within the United States.  Those steps included obtaining millions of dollars of financing from a New York bank and arranging multiple multi-million dollar contracts and other agreements with various United States companies.  *Id.* at 308-309.  There is no evidence of such "steps" here and, significantly, none of the defendants enjoined in *Paulsson* were non-US citizens.

Finally, in *Le Ballets Trockadero de Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563 (S.D.N.Y. 1996), where the court also permitted extraterritorial application of the Lanham Act, defendants specifically "engaged in conduct in the United States designed to further their infringing activities," including forming "a

46

New York corporation in order to extend [their] business operations, to create a New York presence, and to organize" the infringing activity (which, in this case, was an all-male ballet tour with a confusingly similar name). *Id.* at 567. Again, Lubecore has no corporate presence in the United States.

There is simply no evidence that Lubecore's pump sales in Canada have a substantial effect on commerce in the United States or that an injunction barring Lubecore from selling its single line EP0 grease pump in Canada is necessary to protect Groeneveld's interests in the United States. The plaintiff in this case is Groeneveld Transport Efficiency, Inc., an Ohio company, not its Canadian sister, CPL Systems Canada.

With respect to the second prong of the *Libbey Glass* test, Groeneveld concedes, as it must, that Lubecore is not a corporate citizen of the United States. By contrast, in every case cited by Groeneveld where a court permitted the extraterritorial application of the Lanham Act, there was at least one defendant that was a United States citizen. *See Libbey Glass,* 61 F. Supp.2d 720 (Oneida is a corporate citizen of New York); *A.V. Versace, Inc.*, 126 F. Supp. 2d 328 (one defendant incorporated in New York and individual defendant who was nominally an Italian citizen was a permanent US resident and did all of his business from New York); *Scanvec*, 80 Fed. App'x 171 (defendants included citizens and multinational corporate defendants with places of business in the United States);

*Paulsson*, 529 F.3d 303 (defendants included two citizens of Texas and one Californian); *Le Ballets Trockadero*, 945 F.Supp. 563 (defendants included several American citizens, including one New York corporation); *Reebok Int'l, Ltd. v. Marnatech Enters, Inc.*, 970 F.2d 552 (9th Cir. 1992) (as noted in the district court's opinion below, "each of the defendants is an American citizen," 737 F. Supp. 1515, 1520 (S.D. Cal. 1989)); *Amer. Rice, Inc. v. The Arkansas Rice Growers Co-op Ass'n*, 701 F.2d 408 (both defendants American citizens); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp*, 111 F.3d 993 (2d Cir. 1997) (the defendant was an American citizen); *Software AG, Inc. v. Consist Software Solutions, Inc.*, 2008 U.S. Dist. LEXIS 19347 (one defendant a Delaware corporation and the other a permanent resident of New York); *Rhino Membranes & Coatings, Inc. v. Rhino Seamless Membrane Sys., Inc.*, 2006 U.S. Dist. LEXIS 47957 (several of the defendants United States citizens); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994) (although Bayer is a multinational corporation headed in Germany, several named defendants were United States corporations); *Aerogroup, Int'l, Inc. v. Marlboro Footworks, Ltd.*, 1998 U.S. App. LEXIS 7733 (Fed. Cir.) (at least one defendant a United States citizen); *Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs Sarl*, 2011 U.S. Dist. LEXIS 72976 (E.D. Mich.) (one of the defendants a Delaware corporation); *Liberty Toy Co. v. Fred Silber Co.*, 1998 U.S. App. LEXIS 14866 (6th Cir.) (Fred Silber, one

48

of the named defendants, was a Michigan citizen); *Steele v. Bulova Watch Co., Inc.*, 344 U.S. 280 (1952) (defendant a United States citizen).

The fact that there is no United States defendant in this case weighs heavily against applying the Lanham Act extraterritorially. *See*, *e.g.*, *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F. Supp. 220, 227 (S.D.N.Y.1997) ("the citizenship of the defendant is the most significant factor in determining whether to apply the Lanham Act extraterritorially to a defendant's foreign activities"). In fact, in the only case cited by Groeneveld that had exclusively foreign defendants – *Vanity Fair* – the Second Circuit refused to enjoin the Canadian defendant's activities in Canada. *See Vanity Fair*, 234 F.2d at 642-43 (explaining that the extraterritorial reach that the federal courts have read into the Lanham Act is "thoroughly based on the power of the United States to govern the conduct of its own citizens . . . in foreign countries").

In addition, in *Sterling Drug*, the Second Circuit found that the district court's injunction, aimed in part at entirely foreign activities and sales, was overbroad, and remanded the case to the trial court to issue an injunction that was "carefully crafted to prohibit only those foreign uses . . . that are likely to have significant [infringing] effects on United States commerce." *Sterling Drug*, 14 F.3d at 747; *see also id.* (explaining that because "both parties have legitimate interests,

consideration of those interests must receive especially sensitive accommodation in the international context").

Finally, the last prong only holds significant weight in cases where the defendant can claim that it held the exact same right—to a mark, a dress, etc.—in the foreign jurisdiction. Here, although Lubecore has registered its own trademark—which appears prominently on all of its products—in both the United States and Canada, Lubecore does not make any claim of right to the "silhouette" of Groeneveld's single line EP0 greasing pump as trade dress.

In sum, Groeneveld cannot satisfy the *Libbey Glass* test and is not entitled to an extraterritorial injunction. Groeneveld has not presented any evidence of its damages or how it—an Ohio corporation—could be damaged by consumer confusion in Canada. *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) (refusing to enjoin use of an infringing trade dress in Canada because the plaintiff had not submitted any evidence that it was injured by the Canadian use); *see also Playboy Enterprises, Inc. v. Chuckleberry Publishing*, *Inc.*, 511 F. Supp. 486, 496 (S.D.N.Y. 1981) (declining to enjoin the defendant's foreign activities when "the focus of th[e] litigation [was] on infringement and confusion among American consumers" and the plaintiff had "not submitted the evidence necessary to determine whether consumers in other nations would also be confused.")

If this Court upholds the permanent injunction, the district court's proper decision to limit the injunction to the United States should be followed.

## IV.   CONCLUSION

For all of the foregoing reasons, Lubecore asks this Court to vacate the judgment of the district court, and enter final judgment in its favor, or, in the alternative and jointly, order a new trial.  In addition, and if necessary, Lubecore requests that this Court affirm in all respects the district court's ruling in favor of Lubecore on its Rule 50 Motion, and affirm the geographic scope of the injunction issued by the district court.

Respectfully submitted,

   /s/ Melissa L. Zujkowski
Thomas L. Anastos  (0043545)
Melissa L. Zujkowski (0078227)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile:  (216) 583-7001
tanastos@ulmer.com
mzujkowski@ulmer.com

Counsel for Appellant
Lubecore International, Inc.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the type style requirements of Fed. R. App. P. 32(a)(6) because:   this brief contains 11,857 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman style.

     /s/ Melissa L. Zujkowski
Counsel for Appellant
Lubecore International, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2013 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.


    /s/ Melissa L. Zujkowski
Counsel for Appellant
Lubecore International, Inc.